UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

UNITED STATES OF AMERICA


v.                                    Case No. 6:23-mj-2348-EJK

JOSHUA JOSEPH GRAY, also

known as Phocion Thegood


## CLOSING BRIEF

This case raises significant constitutional concerns, especially as to

what rights individuals have when observing and recording public

employees and law enforcement personnel in public places.

## QUESTIONS POSED

Your Honor, I would like to begin with the questions that you raised at

the conclusion of trial.  Your initial question was what authority do they

(SSA) have to limit videography when the CFR only mentions

photography.  The argument could be made that a video is nothing more

than a series of photos.  SSA has no security regulation, rule, order that

restricts photography.  The only mention is in the POMs, confirming the

GSA rule is guiding.   The SSA has no authority because no deviation was ever sought.

I assert that the authority comes from Exhibit 11, the DHS Operational Readiness Order.  This is the only official mention that I am aware. This order, which explicitly states that:

> "The purpose of the bulletin was to remind FPS personnel and PSOs that the public has the right to photograph the exterior of federal facilities from public forums. Since the publication of the bulletin, FPS has experienced an increase in the public's interest in photographing and videotaping both exterior and interior of federal facilities protected by FPS, to include individual's expressing their First Amendment-protected rights by intentionally photographing and videotaping the exterior and interior of a federal facility and law enforcement in the course of their duties to test FPS law enforcement and PSO response. Also, new case law impacts the interpretation and implementation of FPS enforced regulations.
>
> (U/FOUO) To address this increase in photography and videotaping by the public, this Operational Readiness Order reiterates the 2010 guidance; provides clarification on the public's right to photograph publicly accessible federal facility building entrances, lobbies, foyers, corridors and auditoriums; and directs FPS law enforcement personnel and PSOs to maintain security without adversely impacting the public's rights relating to photography and videotaping."

Second, was the question of leased space.  The United States has offered no witnesses nor evidence from either the SSA nor the GSA that could have answered these questions with certainty and clarity.  The United States has offered no lease evidence that confirms or even suggests that the public lobby is "tenant space".   Every witness testified that we were never in an area that wasn't open to the general public.  It is clear that 41 CFR 102-74.420 (c) refers to the publicly accessible areas.

I stand accused of violating 41 CFR 102-74.420 and 41 CFR 102-74.385. The problem is that 41 CFR 102-74.420 expressly permits filming.

What is the policy concerning photographs for news, advertising or commercial purposes?

Except where security regulations, rules, orders, or directives apply or a Federal court order or rule prohibits it, persons entering in or on Federal property may take photographs of—

(a) Space occupied by a tenant agency for non-commercial purposes only with the permission of the occupying agency concerned;

(b) Space occupied by a tenant agency for commercial purposes only with written permission of an authorized official of the occupying agency concerned; and

(c) Building entrances, lobbies, foyers, corridors, or auditoriums for news purposes.

Both (a) and (b) refer to space occupied by the tenant agency - this is space beyond the lobbies, foyers, corridors ect.  This is the area restricted to public access.

(c)  clearly outlines the areas that are normally open to the public. Subject to reasonable time, manner and place restrictions.  The People and the Press have the same right of access because the people and the press are the same.

In the 1978 Supreme court case Houchins v. KQED, Inc. MR. JUSTICE STEWART, while agreeing that the Constitution does no more than assure the public and the press equal access to information generated or controlled by the government once the government has opened its doors, concluded that terms of access that are reasonably imposed on individual members of the public may -- if they impede effective

reporting without sufficient justification -- be unreasonable as applied to journalists.  No security regulation, rule, or order exists that restricts photography.

It was the Honorable Jesus G. Bernal, United States District Judge in US v Rosebrock that said in an Order Affirming Judgment of Dismissal (IN CHAMBERS)

"The General Services Administration ("GSA") regulation of news photography is facially similar to the VA regulation. It states that "persons entering in or on Federal property may take photographs of . . . [b]uilding entrances, lobbies, foyers, corridors, or auditoriums for news purposes." 41 C.F.R. § 102-74.420(c). Nevertheless, the GSA regulation of photography as a whole is dissimilar to the VA regulation in that the GSA regulation limits photography for all purposes. Subsections (a) and (b) of the GSA regulation restrict photography taken for noncommercial and commercial purposes, respectively, without the consent of the occupying agency. 41 C.F.R. § 102-74.420(a)–(b). The universe of photographic purposes is restricted by these two subsections alone. No matter the photographic purpose, a photographer must seek permission from the occupying agency—except when taking photography

authorized under the news photography subsection. Subsection (c), which permits news photography in certain locations, is best read as a qualification of subsections (a) and (b): permission need not be sought by persons who take photographs of "[b]uilding entrances, lobbies, foyers, corridors, or auditoriums for news purposes."

Third is the question of news. Today, civilians armed with smartphones are increasingly performing the watchdog functions associated with the traditional news press. This is surpassingly important because "[s]erendipitous amateur image capture can fill some of the lacunae left by the decimation of salaried news staffs." Kreimer, Pervasive Image Capture and the First Amendment, 159 U. Penn. L. Rev. at 350. As demonstrated below, such image-capture and recordings are more often responsible for bringing to light events which otherwise would go unnoticed or unreported. See Fed. Commc'ns Comm'n v. CBS Corp., 567 U.S. 953, 953 (2012) (Roberts, C.J., concurring) ("As every schoolchild knows, a picture is worth a thousand words."). As such, protecting the right to observe and record interactions between law enforcement personnel and individuals must be enshrined.

This is particularly important because, as Professor Richardson observes, "courts repeatedly defer to the judgments of all officers, with no inquiry into the particular officer's training, experience, and skill." L. Song Richardson, Police Efficiency and the Fourth Amendment, 87 Ind. L.J. 1143, 1155 (2012). Accordingly, cameras have become an effective tool for ordinary civilians to protect against and expose police abuses. Unfortunately, it has taken several recent events to demonstrate the importance of the citizen-journalist – whether or not he or she intended to be one – in shedding light on police killings of minorities.

For example, in December 2014, a black man, Eric Garner, was killed by a chokehold from a police officer. While the grand jury did not indict the police officer, the killing, which was recorded by a private citizen, Ramsey Orta, served to draw mass attention to the interactions between law enforcement personnel and minorities. See J. David Goodman & Al Baker, New York Officer Facing No Charges in Chokehold Case, N.Y. Times, Dec. 4, 2014, at A1.

Similarly, in connection with the Walter Scott killing in North Charleston, South Carolina on April 4, 2015, the police officer

implicated had stated that he feared for his life after Mr. Scott had disarmed him. The video recording by Feidin Santana, an individual who happened to be walking by at the time, shows an unarmed Mr. Scott running away before being shot eight times. The footage also shows the officer placing an object near the body of Mr. Scott. As one report stated, Mr. Santana's video "opened the eyes of millions of Americans who previously doubted that a police officer would be capable of shooting anyone who didn't truly deserve it. It takes away their certainty (until the next unrecorded shooting) that it is always the victim's fault." Tony Norman, Video for Once Allows Police No Excuses, Pittsburgh Post-Gazette, Apr. 10, 2015, at A-2.

As the Court is no doubt aware, these are sadly not isolated instances. Accordingly, "because the police have traditionally been the ones with control over official narratives about police conduct in court and in the news, the ability to counter those narratives with stories backed up by video has transformed the nature of both public opinion and court testimony." Jocelyn Simonson, Beyond Body Cameras: Defending a Robust Right to Record the Police, 104 Geo. L.J. 1559, 1571 (2016).

And, of course, the civilian recording of George Floyd's brutal arrest by Minneapolis police officers graphically depicted the needless violence inflicted by law enforcement, sparking nationwide protests and what has been described as the largest movement in the country's history. See Larry Buchanan et al., Black Lives Matter May Be the Largest Movement in U.S. History, N.Y. Times (July 3,2020), https://www.nytimes.com/interactive/2020/07/03/us/g eorge-floyd-protests-crowd-size.html.

Absent a holding that there is an unequivocal First Amendment right to observe and record law enforcement, many citizen-journalists' activities will be subject to chilling effects. Failing to hold such a right exists would rely on an outdated notion of what constitutes the press and, perhaps more concerning, who is entitled to First Amendment protections. Over forty years ago, this Court recognized that "liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods." Branzburg, 408 U.S. at 704.

More recently, the Ninth Circuit recognized that "[t]he protections of the First Amendment do not turn on whether the [party] was a trained journalist, formally affiliated with traditional news entities, engaged in conflict-of-interest disclosure, went beyond just assembling others' writings, or tried to get both sides of a story." Obsidian Fin. Grp., LLC v. Cox, 740 F.3d 1284, 1291 (9th Cir. 2014). It pointed out that "a First Amendment distinction between the institutional press and other speakers is unworkable: 'With the advent of the Internet and the decline of print and broadcast media . . . the line between the media and others who wish to comment on political and social issues becomes far more blurred.'" Id. (alteration in original) (quoting Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 352 (2010)). As another court wrote in recognizing the constitutional rights of civilians to record police in public, developments in technology "make clear why the news-gathering protections of the First Amendment cannot turn on professional credentials or status." Glik, 655 F.3d at 84.

Absent a holding from this Court, individuals may be dissuaded from taking actions to capture future instances of DHS/PSO interaction with civilians. Such concerns are by no means hypothetical. Mr. Santana

moved out of the North Charleston area and stated that "[o]ne of my concerns before giving the video to the family was retaliation from the police department." Josh Sanburn, The Witness, Time, http://time.com/ramsey-orta-eric-garner-video/. The implications of a lack of clarity or consistency on whether observing and recording law enforcement personnel is a protected right will cause people to self-censor the subjects whom they would otherwise observe and record when faced with the possibility of retaliation.

Moreover, clarifying the right to observe and record law enforcement will have a minimal burden on law enforcement personnel – perhaps only a tangential one no different from the daily inconveniences they are expected to tolerate and under which some of their colleagues in areas that have recognized the right already operate. Additionally, the "threat" of being recorded, along with the ubiquity of video-recording devices, could be expected to make law enforcement officials think twice before using disproportionate force and, perhaps, reduce the number of injuries and deaths that could and should have been avoided. See Garcia v. Montgomery Cnty., 145 F. Supp. 3d 492, 507 (D. Md. 2015) ("[R]ecording police activity enables citizens to 'keep them honest,' an

undertaking protected by the First Amendment."). Indeed, "[c]aptured images need not be conveyed to others to have a salutary effect. Just as public surveillance cameras are said to reduce crime, the prospect of private image capture provides a deterrent to official actions that would evoke liability or condemnation." Kreimer, Pervasive Image Capture and the First Amendment, 159 U. Penn. L. Rev. at 347.  The First Amendment guarantees the right for everyone to be news.

## ARGUMENT

  Your Honor, the People have a First Amendment Protected Liberty Interest in keeping a watchful eye over government.  It is a clearly established right to be able to film our public employees in the course of their duties.  This clearly established right was recognized here in the 11th Circuit in 2000, Smith v. City of Cumming which stated,

> "we agree with the Smiths that they had a First Amendment
> right, subject to reasonable time, manner and place restrictions, to
> photograph or videotape police conduct.   The First Amendment
> protects the right to gather information about what public officials
> do on public property, and specifically, a right to record matters of
> public interest."

I have a First Amendment Protected Right to report on SSA violating rights. Subject to reasonable time, manner and place restrictions.  I was in SSA during normal business hours,  behaving in a manner as not to disrupt the natural flow of business ( let it be noted that it was the United States Attorney General that just argued that the act of filming is a non-expressive act in Price v. Garland (DC Circuit 2022)), in a place that was open to the general public. The D.C. Circuit held that regulation of filmmaking on government-controlled property (including public forums) need survive only a "reasonableness" inquiry,[6] because filmmaking is "merely a noncommunicative step in the production of speech."

Inspector Mohammed confirmed during trial that the Protective Service Officers are law enforcement officers in an exchange with Mr. Del Mastro (p 148 beginning on line 3)

> A: "We have protective security officers which is a contracted position under -- working under an FPS contract. Right now Paragon has the contract, and they provide protective security officers for all our Social Security Administration offices. And they're an extension of FPS law enforcement and enforce rules and regulations and any federal laws that they have while on duty.

Q : You said "an extension."

What do you mean by that?

A:  So as inspectors and special agents in the field for FPS, we don't have -- we're pretty short-staffed. So we can't be everywhere all the time. So we utilize our protective security officer as an extension of FPS in a sense."

Setting aside the verbiage encompassing a right to record (Smith v Cumming) "government officials in the course of their duty."  The United States asserts and FPS Inspector Mohammed confirms that the PSO's are acting as Law enforcement.  Every Circuit that has ruled on the right to record Police has affirmed this right of the people.

Observing and recording law enforcement personnel in public places is protected by the First Amendment. Not only is the right to observe and record law enforcement activities and personnel in public places an established First Amendment right, but the right is essential to protect the citizen-press, which plays an ever- increasingly important role in the dissemination of information. Indeed, "[t]he right to record police activity is important not only as a form of expression, but also as a practical check on police power. Recordings of police misconduct have played a vital role in the national conversation about criminal justice

for decades." Crocker v. Beatty, 995 F.3d 1232, 1261 (11th Cir. 2021)
(Martin, J., concurring in part and dissenting in part).

In Branzburg v. Hayes, the Supreme Court noted that "without some
protection for seeking out the news, freedom of the press could be
eviscerated." 408 U.S. 665, 681 (1972). Professor Kreimer explains that
"[i]mage capture can document activities that are proper subjects of
public deliberation but which the protagonists would prefer to keep
hidden and deniable." Seth F. Kreimer, Pervasive Image Capture and
the First Amendment: Memory, Discourse, and the Right to Record, 159
U. Penn. L. Rev. 335, 345 (2011). Police regularly operate on public
streets and sidewalks, which "are areas that have historically been open
to the public for speech activities." McCullen v. Coakley, 573 U.S. 464,
476 (2014). Moreover, the conduct of police, as government officials, is a
matter of public concern; and speech regarding matters of public
concern is, as this Court has repeatedly reiterated, including in Snyder
v. Phelps, 562 U.S. 443, 451-52 (2011), at the heart of the First
Amendment. Such a "loss of First Amendment freedoms, for even
minimal periods of time, unquestionably constitutes irreparable injury."
Elrod v. Burns, 427 U.S. 347, 373 (1976).

It is no surprise that several federal courts of appeals have found a constitutional right to record law enforcement personnel when they conduct operations in public. See, e.g., Irizarry v. Yehia, 38 F.4th 1282, 1290-92, 1294 (10th Cir. 2022) (listing and summarizing cases finding a First Amendment right to film the police in public from the First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits, and holding the right to be clearly established "beyond debate".

The Ninth Circuit, for example, has held that an individual's "First Amendment rights were clearly established at the time of his arrest" when photographing police actions. Adkins v. Limtiaco, 537 F. App'x 721, 722 (9th Cir. 2013). The First Circuit framed the question directly by asking "is there a constitutionally protected right to videotape police carrying out their duties in public?" Glik v. Cunniffe, 655 F.3d 78, 82 (1st Cir. 2011). In answering that question, the court held that

[b]asic First Amendment principles, along with case law from this and other circuits, answer that question unambiguously in the affirmative.

. . . Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment

interest in protecting and promoting "the free discussion of governmental affairs."

Id. (quoting Mills v. Alabama, 384 U.S. 214, 216 (1966)). In so ruling, the First Circuit applied the following logic: if police officers must accept "a significant amount of verbal criticism and challenge directed at" them, then they must be expected to exercise similar restraint "when they are merely the subject of videotaping that memorializes, without impairing, their work in public spaces." Id. at 84 (quoting in part City of Houston v. Hill, 482 U.S. 451, 461 (1987)). Likewise, the Eleventh Circuit held that civilians have a First Amendment right to record the police because "the First Amendment protects the right to gather information about what public officials do on public property." Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000).

Perhaps more tellingly, in upholding the right to record law enforcement personnel, the Seventh Circuit described as "an extreme position" and "an extraordinary argument" the contention of the State's Attorney "that openly recording what police officers say while performing their duties in traditional public fora — streets, sidewalks,

plazas, and parks — is wholly unprotected by the First Amendment."
Am. Civil Liberties Union of Ill. v. Alvarez, 679 F.3d 583, 594 (7th Cir.
2012). The Seventh Circuit went on to hold that [a]udio and audiovisual
recording are media of expression commonly used for the preservation
and dissemination of information and ideas and thus are "included
within the free speech and free press guaranty of the First and
Fourteenth Amendments." Laws that restrict the use of expressive
media have obvious effects on speech and press rights; the Supreme
Court has "voiced particular concern with laws that foreclose an entire
medium of expression."

The act of making an audio or audiovisual recording is necessarily
included within the First Amendment's guarantee of speech and press
rights as a corollary of the right to disseminate the resulting recording.
The right to publish or broadcast an audio or audiovisual recording
would be insecure, or largely ineffective, if the antecedent act of making
the recording is wholly unprotected, as the United States insists. By
way of a simple analogy, banning photography or note- taking at a
public event would raise serious First Amendment concerns; a law of
that sort would obviously affect the right to publish the resulting

photograph or disseminate a report derived from the notes. The same is true of a ban on audio and audiovisual recording.

Id. at 595-96 (internal citations omitted).

More recently, the Third Circuit upheld the right of individuals to photograph or videotape law enforcement personnel in public. See Fields, 862 F.3d at 360 ("In sum, under the First Amendment's right of access to information the public has the commensurate right to record—photograph, film, or audio record—police officers conducting official police activity in public areas."). Likewise, the Tenth Circuit found that filming police was clearly established First Amendment activity, and therefore denied qualified immunity to a police officer who obstructed a civilian's recording. Irizarry, 38 F.4th at 1298.

These cases show that the First Amendment right to observe and record law enforcement personnel in public is now well-established. See Fields, 862 F.3d at 355 ("Every Circuit Court of Appeals to address this issue . . . has held that there is a First Amendment right to record police activity in public. Today we join this growing consensus." (citations omitted)); Irizarry, 38 F.4th at 1290-92, 1294.

As the Seventh, Eighth, and Tenth Circuits have explained, the antecedent acts to recording, like observation, must necessarily be protected as well. Alvarez, 679 F.3d at 595-96 (7th Cir. 2012), supra at 6-7; Chestnut v. Wallace, 947 F.3d 1085, 1091 (8th Cir. 2020) ("if the constitution protects one who records police activity, then surely it protects one who merely observes it"); Irizarry, 38 F.4th at 1290 (10th Cir. 2022) ("If the creation of speech did not warrant protection under the First Amendment, the government could bypass the Constitution by simply proceeding upstream and damming the source of speech.").

"Filming the police . . . acts as a watchdog of government activity and furthers debate on matters of public concern." Irizarry, 38 F.4th at 1289 (internal quotation marks and citation omitted). Thus, it is likely that opposition to observation and recording of police activities stems from the fact that "many would prefer to be in a position to shape perceptions of their actions without competing digital records. Police officers often view private digital image capture as a challenge to their authority." Kreimer, Pervasive Image Capture and the First Amendment, 159 U. Penn. L. Rev. at 357. This, rather than purported safety concerns associated with being recorded, has resulted in a "rich set of cases in

which police have sought to prosecute critics or potential critics who

capture their images. In these cases, police officers and other officials

have enlisted both existing statutes and creative prosecutorial

discretion in the struggle to constrain inconvenient image capture." Id.

Until recently, if not continuing, police officers have "invoke[d] the

wiretap statute against those who antagonize them by recording them."

Id. at 359 n.79 (collecting cases from Pennsylvania).

Indeed, [t]he typical police officer, plaintiff, or complainant in the

image-capture cases canvassed above is not concerned with avoiding

observation or preserving seclusion simplic[i]ter. She is interested,

rather, in assuring that evidence of dubious or potentially embarrassing

actions is not credibly conveyed by the observer to a wider audience by

transmission of the captured image. There are few cases on record of

police officers arresting tourists who capture videos of polite official

responses to inquiries for directions. Prohibitions on image capture are

deployed to suppress inconvenient truths.

Id. at 383. Such conduct cannot be countenanced in a society in which

"[t]he freedom of individuals verbally to oppose or challenge police

action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." Hill, 482 U.S. at 462-63. At a minimum, the First Amendment "demands some sacrifice of [police] efficiency . . . to the forces of private opposition." Id. at 463 n.12 (ellipsis in original).

Your Honor, we cannot ignore the internal guidance from the Department of Homeland Security that the United States and Inspector Mohammed completely ignores.

On p198 of TRANSCRIPT OF BENCH TRIAL Mr. Gray asks, "does the public have to follow an order from you that's not backed by any law? Inspector Mohammed answers, "I wouldn't give an order that wasn't backed by law. I wouldn't give an unlawful order.

Yet the guidance from US Dept of Homeland Security is completely overlooked, which states, "Furthermore, it is important to understand that 41 CFR 102-74.420 does not prohibit photography by individuals of the exterior of federally owned or leased facilities. Rather, this regulation describes when an

individual may photograph the interior of federally buildings, i.e.,
"space occupied by a tenant agency" or "building entrances, lobbies,
foyers, corridors, or auditoriums."

"As a reminder, photography and videotaping, absent a criminal
predicate, is First Amendment protected activity."

It is later in the same questioning, p207 beginning on line 11:

> Q: Is the general public allowed to record their interviews?
> A: With the permission from the tenant agency.
> Q: Maybe I wasn't clear. Can a member of the general public audio
> record their visit?
>
> A: With permission.
> Q: Could you just direct me to where it says that.
> A: Photography and video recording are prohibited in federal
> space without the permission of the tenant agency.
>
> Q: Right.
>
> Q: So we were just talking about audio recording.
>
> A: I believe it covers both.

Inspector Mohammed must acknowledge that had he given orders to
cease recording in this instance it would have been just as unlawful as
the tickets he issued Mr. Gray.

Luis Flores stated on cross examination (TRANSCRIPT OF BENCH

TRIAL, VOL I, p67 12-23):

> Q: So just to -- just to clarify, you can -- you can take photographs inside the Social Security Administration?
>
> A Are you talking about the QR reader?
>
> Q: Well ,does it –yes, I am talking about the QR reader.
> A: So in that instance, yes, then you would be taking a picture of a QR code but nothing else except that code.
> Q: Is there some guidance or a written policy that lets the public know that they're only allowed to take photographs of QR codes and not anything else in the office?
>
> A: Not that I know of.

Pierre Saurez, although more hostile than the other witnesses he also admitted that (p97 line 2) "Yes. But on part (a) –" when asked "you would agree that this document says that you may film in building entrances, lobbies, foyers, corridors, and auditoriums for news purposes?"

Kimberly Davenport stated on cross examination:

> Q:I was wondering, according to this CFR, are persons entering in or on federal property allowed to take photographs of Subsection (c)?
> A: Subsection (c) just tells where news purposes can happen at for federal buildings.
> Q: And that's where you can record for news purposes?
> A: Correct, as in --
> Q: Thank you.
> A: -- for what (c) says.
> Q: So just to be clear, Subsection (c) is where you can record?

A: Sorry. I didn't know you were asking me a question. It says you can for news purposes within those areas federal building in Subsection (c).
Q: Thank you, Ms. Davenport.

Inspector Mohammed is the only witness that didn't admit on the stand that filming was permitted.  Yet he contends there is no confusion regarding the rules governing conduct on Federal Property.  It is the GSA that sets the rules and absent a Deviation any federal agency policy would be subordinate to GSA rules,  specifically 102-74.420.

When questioned by Mr. Skuthan, Inspector Mohammed said:

Q: But under Exhibit 11, which is a directive, it says include this policy. "Therefore, a signed release of any Photography and video recording are clearly, as you stated before, that recognizing the fact the public is allowed to photograph interior buildings, entrances, lobbies, foyers, corridors, auditoriums or publicly accessible areas.

For example, someone can photograph in the common space of a publicly accessible lobby of a federal facility, right?

A Yes, sir. But then it's put into context by the first paragraph of how the section starts off that says, "Except where a security regulation or court order or rule or something to that effect prohibits recording, they must get permission."

Q And where's the security regulation?

A The signage is a direction and regulation along with the policy that you just --

     Q But if the CFR says -- it doesn't say permission is required if
     you're a member of the media and you're filming in entrances,
     lobbies, foyers, corridors --

A police officer is not a law unto himself;  he cannot give an order that

has no colorable legal basis and then arrest a person who defies it. [So it

is here:  because my activities were peaceful, not performed in

derogation of any law, and done in the exercise of my First Amendment

rights, SSA / FPS lacked the authority to stop Mr. Gray.

## CONCLUSION

The description of my channel reads: I am an Independent Citizen

Journalist.  This Channel is dedicated to ensuring our Natural Rights

are respected by those that swore an oath to support, protect, and

defend the Rights of the People.  The purpose of all interactions is to

promote government accountability and transparency. I implore you to

peacefully seek redress to any and all of your grievances.  This is a

Public Service.

 I'm not shocked that I'm not popular with government.  But this is

my/our Civic Duty.  I would much rather be at home with my family or

out solely trying to grow our small business, Lord knows the added

stress from this going on since last January has taken a toll on me.  But

should I ignore when I see wrongdoing in our Republic?

 In Federalist No 84. Hamilton writes,

> "I go further, and affirm that bills of rights, in the sense and to the
> extent in which they are contended for, are not only unnecessary
> in the proposed Constitution, but would even be dangerous. They
> would contain various exceptions to powers not granted; and, on
> this very account, would afford a colorable pretext to claim more
> than were granted. For why declare that things shall not be done
> which there is no power to do? Why, for instance, should it be said
> that the liberty of the press shall not be restrained, when no
> power is given by which restrictions may be imposed? I will not
> contend that such a provision would confer a regulating power;
> but it is evident that it would furnish, to men disposed to usurp, a
> plausible pretense for claiming that power. They might urge with
> a semblance of reason, that the Constitution ought not to be
> charged with the absurdity of providing against the abuse of an
> authority which was not given, and that the provision against
> restraining the liberty of the press afforded a clear implication,
> that a power to prescribe proper regulations concerning it was
> intended to be vested in the national government. This may serve
> as a specimen of the numerous handles which would be given to
> the doctrine of constructive powers, by the indulgence of an
> injudicious zeal for bills of rights.

> On the subject of the liberty of the press, as much as has been
> said, I cannot forbear adding a remark or two: in the first place, I
> observe, that there is not a syllable concerning it in the
> constitution of this State; in the next, I contend, that whatever
> has been said about it in that of any other State, amounts to
> nothing. What signifies a declaration, that "the liberty of the press

shall be inviolably preserved"? What is the liberty of the press? Who can give it any definition which would not leave the utmost latitude for evasion? I hold it to be impracticable; and from this I infer, that its security, whatever fine declarations may be inserted in any constitution respecting it, must altogether depend on public opinion, and on the general spirit of the people and of the government.[3] And here, after all, as is intimated upon another occasion, must we seek for the only solid basis of all our rights.

3. To show that there is a power in the Constitution by which the liberty of the press may be affected, recourse has been had to the power of taxation. It is said that duties may be laid upon the publications so high as to amount to a prohibition. I know not by what logic it could be maintained that the declarations in the State constitutions, in favor of the freedom of the press, would be a constitutional impediment to the imposition of duties upon publications by the State legislatures. It cannot certainly be pretended that any degree of duties, however low, would be an abridgment of the liberty of the press. We know that newspapers are taxed in Great Britain, and yet it is notorious that the press nowhere enjoys greater liberty than in that country. And if duties of any kind may be laid without a violation of that liberty, it is evident that the extent must depend on legislative discretion, respecting the liberty of the press, will give it no greater security than it will have without them. The same invasions of it may be effected under the State constitutions which contain those declarations through the means of taxation, as under the proposed Constitution, which has nothing of the kind. It would be quite as significant to declare that government ought to be free, that taxes ought not to be excessive, etc., as that the liberty of the press ought not to be restrained.

Hamilton, though brilliant, lacked the vision to see that even with a Bill of Rights that our Rights would constantly be under assault from our Government.  I understand that filming can make people uncomfortable, that isn't lost on me.  Freedom can be uncomfortable, but I never had any intention of breaking the law.  I read the law, and words matter.  Social security has a Policy on audio recording - it has no known policy on video recording.  Simply because the audio recording policy mentions video doesn't turn that into a video recording policy. The CFR is clear.  There is no security regulation, rule, order or directive.  And because none exists, " persons entering in or on Federal property may take photographs of  — (c) Building entrances, lobbies, foyers, corridors.

Because they lack the authority to ask me to stop filming, their orders are not lawful and I had no lawful obligation to follow them.

  I ask your Honor to rule in my favor, finding me not guilty of all charges.

Respectfully submitted,

Joshua Joseph Gray

a/k/a Phocion Thegood

U.S. v. Joshua Joseph Gray                    Case No. 6:23-mj-2348-EJK

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the United States (Mr. Del Mastro)

Katherine Henry did not assist in the production of this Brief in any way, she only served upon the court.

By: Katherine Henry, Esq.