UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 6:23-mj-2348-EJK

JOSHUA JOSEPH GRAY
GEORGE DOUGLAS METZ

**UNITED STATES' BRIEF IN SUMMATION AND OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITAL**

Pursuant to the Court's post-trial scheduling order, the United States files the following brief in summation. The evidence admitted at trial proves beyond a reasonable doubt that the defendants committed each of the charged offenses. Accordingly, the Court should deny the defendants' motion for judgment of acquittal and find the defendants guilty on all counts.

**I.      Elements of the charged offenses.**

Each defendant is charged with three counts of violating 41 C.F.R. § 102-74.385, and three counts of violating 41 C.F.R. § 102.420 (Doc. 1). The elements of 41 C.F.R. § 102-74.385 are:

(1) The defendant was in or on Federal property; and

(2) The defendant knowingly failed to comply with official signs of a prohibitory, regulatory, or directory nature, or with the lawful direction of Federal police officers or other authorized individuals.

The elements of 41 C.F.R. § 102-74.420 are:

(1) The defendant was in or on Federal property;

(2) The defendant took one or more photographs; and

(3) Such photograph(s) was (were) prohibited by security regulations, rules, orders, or directives, or by a Federal court order or rule, or such photograph(s) was (were) of a space occupied by a tenant agency for non-commercial purposes without the permission of the occupying agency, or such photograph(s) was (were) of a space occupied by a tenant agency for commercial purposes without the written permission of an authorized official of the occupying agency.

## II.   Section 102-74.420 applies to the video recordings in this case and does not violate the First Amendment.

### A.  *"Photograph" includes video.*

Section 102-74.420 sets forth restrictions on the taking of "photographs" on Federal property. Although "photograph" is not defined in 41 C.F.R. Part 102, both its plain meaning and the context of its use in the regulation indicate it includes video. Indeed, both "photograph" and "video" are defined as recordings of "images," the difference being that a video can capture more images and moving images. *See Oxford English Dictionary Online* (2024 ), *available at* https://www.oed.com (last accessed June 25, 2024) (defining a "photograph" as "a picture or image obtained by photography" and defining a "video" as a "recording of moving visual images"); *Merriam-Webster Dictionary Online* (2024), *available at* https://www.merriam-webster.com (last accessed June 25, 2024) (defining "photograph" as "a picture or likeness obtained by photography"; defining "picture"

as  "transitory visible image or reproduction" including a "motion picture" or "movie[]"; and "video" as "a recording of an image or of moving images."). Moreover, a video can be easily distilled down into individual images or photographs via a screenshot or other click of the button.

This interpretation is also supported "by the specific context in which that language is used, and the broader context of the [regulation] as a whole." *Yates v. United States*, 574 U.S. 528, 537 (2015). The purpose of the photography restriction is to delineate the circumstances under which photographs may be taken on federal property so as not to interfere with the provision of services, operational needs, and overall government objectives. *See* 41 C.F.R. § 102.74.10. It would defeat the purposes of the regulation to restrict photography but not videography. In fact, videography is a greater concern given its ability to capture more images and images paired with sound. Of note, at least two other district courts have rendered guilty verdicts for violations of section 102-74.420 where the "photograph" at issue was a video. *United States v. Stamps*, 4:23-cr-164-DGK, at Doc. 11 (D. Mo. July 18, 2023); *United States v. Cordova*, 1:22-po-7015-MEH, at Doc. 16 (D. Colo. Mar. 20, 2023).

**B.  Social Security offices are non-public fora and section 102-72.420 is reasonable.**

As was elicited at trial, all locations of the charged offenses are Social Security field offices, which are "brick-and-mortar building where individuals [go] for face-to-face service" from Social Security Administration (SSA) representatives (Tr. 9-10). These are non-public fora. *United States v. Stamps*, No. 4:23-cr-164-DGK, Doc. 11 at pp. 7-8 (W.D. Mo. July 18, 2023) (Social Security field office is non-public forum);

3

*see also*, *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992) (international airport terminal is non-public forum); *United States v. Kokinda*, 497 U.S. 720, 728-30 (1990) (sidewalk connecting post office entrance to parking lot is non-public forum); *United States v. Gilbert*, 920 F.2d 878, 884-85 (11th Cir. 1991) (interior of federal building and its portico are non-public fora); *Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1204 (11th Cir. 1991) (interstate rest area is non-public forum); *Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1313 (Fed. Cir. 2008) (VA medical centers are non-public fora); *Bugoni v. Slosberg*, No. 10-80867-CIV, 2011 WL 579228, at *8 (S.D. Fla. Feb. 9, 2011) (Department of Motor Vehicles (DMV) office is non-public forum).

Accordingly, the test is whether the restrictions in 41 C.F.R. § 102-74.420 are "reasonable" considering the purpose the property is intended to serve. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983); *United States v. Gilbert*, 130 F.3d 1458, 1461 (11th Cir. 1997). A restriction need only be "reasonable"; "it need not be the most reasonable or only reasonable limitation." *Kokinda*, 497 U.S. at 725.

The purpose of the photography restriction—like other regulations contained in the General Service Administration's ("GSA") facility management regulations in Part 102-74 of Title 41 of the Code of Federal Regulations—is to ensure that federal executive agencies can provide services "consistent with their operational needs" and accomplish "overall Government objectives." 41 C.F.R. § 102.74.10. The GSA reasonably prohibits photography as well as a variety of other expressive conduct in

agency space that can interfere with operational needs or the ability of executive agencies to fulfill their objectives, including soliciting (41 C.F.R. § 102-74.410), commercial advertising (41 C.F.R. § 102-74.410), posting flyers (41 C.F.R. § 102-74.415), and making loud or unusual noises (41 C.F.R. § 102-74.390). The importance of allowing executive agencies to operate efficiently and to fulfill their objectives is undeniable. "Government agencies are charged by law with doing particular tasks [and take actions] to help do those tasks as effectively and efficiently as possible." *Waters v. Churchill*, 511 U.S. 661, 674-75 (1994).

Section 102-74.420 is particularly reasonable as applied to Social Security field offices, which exist to provide in-person service from the SSA regarding a variety of retirement, disability, and needs-based benefit programs, as well as Social Security numbers and cards (Tr. 10-11). By its very nature, this business involves the exchange and discussion of large amounts of sensitive personally identifiable information (PII), such as names, Social Security numbers, dates of birth, addresses, medical records, marriage certificates, and divorce decrees (Tr. 12-14, 25-29). This exchange happens at the check-in kiosk when customers first arrive at the office, at the customer service windows where they receive service and conduct business, and the "drop box" area where they can fill out and drop off paperwork (Tr. 12-13, 26-27). Social Security customers come from all walks of life, including "individuals who are distraught because they might have lost a loved one" and "individuals that have mental and physical impairments" (Tr. 11). In the words of George Metz, "a lot of people depend on Social Security to live" (GE 7b at 18:22-18:25). Filming in these

5

locations risks the recording and dissemination of this sensitive PII and has a predictably chilling effect on members of the public seeking service they may need at these field offices (GE 5a at 4:53-4:55, 18:20, 22:00; Tr. 111, 114). Accordingly, the SSA and the public have a strong interest in protecting this sensitive personal information, and the restriction on filming in Social Security field offices is reasonably tailored to this important interest.

Additionally, it is notable that there are "substantial alternative channels" for individuals and the press to gather information regarding Social Security field offices. *See Perry*, 460 U.S. at 53. As Social Security District Manager Luis Flores testifed, the restriction on filming does not prevent individuals from entering Social Security offices, observing their functioning, reading signs, or taking publications/brochures (Tr. 12, 25, 48, 67-68, 131), and later reporting on that information. Individuals can also obtain information and services by calling the local Social Security office, SSA's 1-800 number, or visiting SSA's website (Tr. 12). And both section 102-74.420 and SSA policy provide an avenue for individuals to request permission to photograph or videorecord in its spaces.

Consistent with the first clause of section 102-74.420, SSA has a security rule that prohibits photography and videorecording in its spaces without written permission of an authorized agency official. This rule is memorialized in signage posted at each Social Security office, including all the offices involved in this case (1a, 2c, 3, 4, 5a-b, 6b, 7b, 8b, 9). Mr. Flores, who has worked for SSA for fifteen years across six different offices, confirmed the rule and testified that it exists "for

security and privacy reasons." (Tr. 9, 18). He also confirmed that the signage

prohibiting photography and videorecording is "standard signage that's posted in

every Social Security office, and that it's subject to an annual audit called a "security

review" (Tr. 30, 78).

As Mr. Flores further testified, the rule is also referenced in SSA's Program

Operations Manual System (POMS) GN 03360.010, which states that "Photography

and video recording are prohibited in Federal space without the permission of the

tenant agency" (GE 10). *See Wash. State Dep't of Soc. & Health Servs. v. Guardianship*

*Est. of Keffeler*, 537 U.S. 371, 385 (2003) (POMS are "the publicly available operating

instructions for processing Social Security claims… and warrant respect."); *Stroup v.*

*Barnhart*, 327 F.3d 1258, 1262 (11th Cir. 2003) ("While the POMS does not have the

force of law, it can be persuasive."). Mr. Flores testified that POMS is SSA's primary

policy resource; that it is publicly available on the internet; and that visitors to the

Social Security office frequently reference it (Tr. at 16-17).

The fact that SSA's security rule is not set forth in its own regulation is of no

moment. The plain language of section 102-74.420 does not require a promulgated

regulation or any other particular form. 41 C.F.R. § 102-74.420 ("Except where

security regulations, rules, orders, *or* directives apply…") (emphasis added). The

Constitution does not require a published regulation either, so long as the rule is

made explicit by well-established practice. *See Families Achieving Independence and*

*Respect v. Nebraska Dep't of Social Services*, 111 F.3d 1408, 1415 (8th Cir. 1997)

(unwritten rule barring advocacy groups from lobby of state welfare office was not

unconstitutionally vague because it was "made explicit by well-established practice.") (internal quotations omitted); *United States v. Moriello*, 980 F.3d 924, 935 (4th Circuit 2020) (finding that "a violation of federal regulations is not a prerequisite for a lawful direction" in upholding conviction under section 102-74.385). "The fact that a policy is not committed to writing does not of itself constitute a First Amendment violation." *Lebron v. Nat'l R.R. Passenger Corp. (Amtrak)*, 69 F.3d 650, 658 (2d Cir. 1995), *opinion amended on denial of reh'g*, 89 F.3d 39 (2d Cir. 1995), *cert denied*, 517 U.S. 1188 (1996); *accord Faustin v. City & County of Denver*, 423 F.3d 1192, 1202 (10th Cir. 2005); *cf. City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 770, 108 S.Ct. 2138, 2151, 100 L.Ed.2d 771 (1988) ("[T]he limits the city claims are implicit in its law must be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice."). As discussed above and further below, the evidence in this case, including the witness testimony, documents, and videos, all show that SSA's security rule on photography and videorecording was made explicit by well-established practice.

## III.   Venue is proper in this Court.

The Court should reject as meritless Metz's argument that there is no venue because the government did not elicit testimony that Ocala, Kissimmee, and Orlando, Florida are in the Middle District of Florida. The government elicited testimony that the Social Security offices where the charged offenses occurred are in Deland, Ocala, Kissimmee, and Orlando, Florida (Tr. 14, 18, 20, 144, 148, 162, 168, 178). The Court is well-aware, as it must be, of the counties and geographical

boundaries of its district, which include these four cities.

https://www.flmd.uscourts.gov/about-court (last accessed July 10, 2024). Indeed,

two of the Court's divisions are namesakes of these cities—Orlando and Ocala. *See*

https://www.flmd.uscourts.gov/divisions (last accessed July 10, 2024).

**IV.    The evidence elicited at trial proves beyond a reasonable doubt the defendants committed the charged offenses.**

     *A.    Count One*

Count One charges Gray with failing to comply with official signs and the

lawful direction of Federal police officers and other authorized individuals on or

about November 16, 2022. At the beginning of Gray's video, he declares that he is at

the "Social Security Administration in Deland, Florida," which is confirmed by the

signage on the front door (GE 1a at 1:09-1:13, 1:21-1:30), and the testimony of

Protective Security Officer ("PSO") Davenport and DHS Federal Protective Services

(FPS) Inspector Mohammed (Tr. 125, 151). They also testified that this incident

happened on or about November 16, 2022 (Tr. 124, 151).

It is undisputed that the Deland Social Security office is Federal property. In

fact, Gray declares it as such approximately six times during the recording he made

there (GE 1a (*e.g.,* at 21:35: "This is Federal property. Whether it's leased or not, it's

Federal property.")). Inspector Mohammed testified that the property is leased by the

General Services Administration (GSA), occupied solely by the SSA, and subject to

Title 41 of the Code of Federal Regulations (C.F.R.) (Tr. 148-51). Section 102-74.385

falls under 41 C.F.R. Subpart C ("Conduct on Federal Property"), and applies to "all

property under the authority of the GSA." 41 C.F.R. § 102-74.365 ("The rules in this subpart apply to all property under the authority of the GSA and to all persons entering in or on such property. Each occupant agency shall be responsible for the observance of these rules and regulations."); *accord* 40 U.S.C. § 1315(c) ("The Secretary [of Homeland Security], in consultation with the Administrator of General Services, may prescribe regulations necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property."); *United States v. Radin*, 821 F. App'x 53, 54 (2d Cir. 2020) (federal courthouse was federal property for purposes of section 102-74.365 because it was "under the authority of the GSA").

The evidence also establishes beyond a reasonable doubt that Gray knowingly failed to comply with both (1) official signs of a prohibitory, regulatory, or directory nature; and (2) the lawful direction of Federal police officers or other authorized individuals. Although the government only needed to prove one of these two directives (signage or officers/individuals), it proved both. *See Moriello*, 980 F.3d at 934-35 (sustaining conviction under section 102-74.385 for failing to follow lawful direction of authorized individuals).

Immediately after he walked into the vestibule of the Deland Social Security office, Gray focused his video recorder on conspicuously displayed signage that read "PHOTOGRAPHY AND VIDEOGRAPHY PROHIBITED," remarked, "so they've got it in here," pointed at the sign, and read aloud, "photography and videography prohibited" (GE 1a at 1:33-1:44). He also remarked "I don't really see a

security staff to speak of" (*id.* at 1:46). Gray then walked through the second set of doors into the office space where Social Security business is conducted while continuing to record. Shortly thereafter, he was confronted by PSO Davenport, who verbally informed him that he could not record within the office and would have to take his video camera outside (*id.* at 2:42-250). In a typed annotation on his videorecording, Gray identifies PSO Davenport as "Security" (*id.* at 2:00). PSO Davenport also pointed Gray to the signage posted inside the vestibule; informed him that she had checked with office management, who had directed that he leave; and advised that she would contact law enforcement if he did not leave (*id.* at 2:52-2:57; Tr. 124, 126-27). Indeed, PSO Davenport testified that she had checked with the officer manager who instructed her that Gray did not have permission to video record in the office (Tr. 130). Gray refused to follow PSO Davenport's lawful direction and continued to record in the office space for several additional minutes until he walked outside to engage with law enforcement (GE 1a at 2:57-6:50).[1]

PSO Davenport and all the other PSOs discussed below are "other authorized individuals" under section 102-74.385. *Moriello*, 980 F.3d at 935 (holding that PSOs are "other authorized individuals" under section 102-74.385 and explaining "PSOs also have the authority to issue lawful directions… To strip PSOs of the authority to issue lawful directions would render them toothless."). Inspector Mohammed testified that PSOs work under an FPS contract and are "an extension of FPS law

---

[1] At various points, Gray's videorecording is set to play at 8x speed, so the videorecording appears shorter than the actual time Gray was in the office recording.

enforcement and enforce rules and regulations and any federal laws that they have while on duty" (Tr. 148, 164). PSO Davenport similarly defined her duties as "enforc[ing] the rules and regulations" pertaining to "Title 41," including rules regarding video recording and photography (Tr. 123). Mr. Flores testified that a PSO is "the primary person who will address any type of security or violations" at an SSA office (Tr. 22-23, 38). Accordingly, the government has proven beyond a reasonable doubt that Gray failed to comply both with official signs of a prohibitory, regulatory, or directory nature, and with the lawful direction of other individuals.

### B. Count Two

Count Two charges Gray with unauthorized photography in violation of 41 C.F.R. § 102-74.420, on or about November 16, 2022. This charge arises from the same incident as Count One at the Deland Social Security office. As set forth for Count One, the government has proved beyond a reasonable doubt that Gray was in or on Federal property. The government has also proved beyond a reasonable doubt that Gray took one or more photographs while he was inside the Deland office. Specifically, Gray recorded the video that's in evidence as GE 1a.

Additionally, the government proved beyond a reasonable doubt that Gray's video recording was prohibited by SSA's security rule, which Gray observed and read as he entered the office (GE 1a at 1:33-1:44). But even before Gray entered the Deland office, he had knowledge of SSA's security rule. Gray began the video by saying that he had just watched a video of another individual who had been

prevented from recording in a South Florida Social Security office, and that he
(Gray) was there to see what Deland SSA would do (GE 1a at 0:23).

Beyond his commentary about the South Florida incident, other evidence
shows Gray was already on notice of SSA's security rule before he even entered the
Deland office. That's because he came equipped with the FPS Operational Readiness
Order on Photography and Videotaping Federal Facilities, and presented it to
responding law enforcement officers (Gray Exhibit 1; GE 1a at 5:43, 12:40, 18:05;
Tr. 160, 162). The Operational Readiness Order (ORO) breaks down section 102-
74.420 by subpart and provides guidance on its application (*id.*). The ORO states:

| REGULATION | APPLICATION |
| --- | --- |
| "Except where security regulations, rules, orders, or directives apply or a Federal court order or rule prohibits it, persons entering in or on Federal property may take photographs of…" | Photography and videotaping the interior of federal facilities is allowed under the conditions set forth in (a) – (c) of the regulation unless there are regulations, rules, orders, directives or a court order that prohibit it. **For example, SSA has rules that prohibit photography and videotaping in its spaces.** Similarly many courts issue no photography or videotaping [orders] in courtrooms and surrounding areas. The prohibition must be clearly posted or actual (in-person) notice must be given in order to be enforced. |

(Gray Exhibit 1 at pp. 2-3) (emphasis added). Gray also brought the ORO with him
when he met with Inspector Mohammed the following day outside the Deland office
(GE 1b at 8:26-9:35; Tr. 154-55, 157-59). Inspector Mohammed explained and
emphasized to Gray the SSA rule, cited in the ORO prohibiting photography and

videotaping in SSA spaces (GE 1b at 9:40-12:07, Tr. 157-59).[2] Inspector Mohammed also explained Gray of the reason for the rule—to protect individuals' privacy and PII—which could be captured by a photograph or video (GE 1b at 12:43-13:26). The ORO is also notable because it's further evidence of SSA's well-established practice of prohibiting photography and videorecording without written permission.

Because photography was prohibited by SSA's security rule, Gray violated the first clause of section 102-74.420, and subsections (a)-(c) of the regulation do not come into play. But, even assuming, *arguendo*, that there wasn't a security rule in place, Gray was in violation of section 102-74.420 because he videorecorded in a space occupied by a tenant agency without the agency's consent. The testimony of Inspector Mohammed and PSO Davenport established that the Deland Social Security office is leased by the GSA and occupied solely by the SSA and that Gray did not have permission to record there (Tr. 124, 126-27, 148-49; GE 1a at 2:52-2:57). Within this space, Gray videorecorded customers in the waiting area, customers conducting business at the service windows, customers using the check-in kiosk, and PSO Davenport and her workstation (*id.* at 2:27-6:48). Further, Gray's YouTube channel solicitations and earnings records show he was recording for commercial purposes, which requires written permission under subsection (b) (GE 12a-12c, 14). But even if he wasn't, he didn't even have verbal permission so he was alternatively in violation of subsection (a) (GE 1a at 2:52-2:57, Tr. 130).

---

[2] Inspector Mohammed testified that other federal agencies/offices have similar restrictions, including: "federal courthouses, F.B.I. locations, [and] certain USCIS locations" (Tr. 212-13).

Inspector Mohammed contrasted standalone spaces that are occupied solely by one federal agency, like the Deland office, with Federal buildings that house multiple agencies with open generalized spaces like, building foyers, lobbies, corridors, auditoriums, and cafeterias (Tr. 149-50, 202; Tr. II 14, 16-17). This distinction is supported by the canon *of noscitur a scoiis*, which provides that "word is known by the company it keeps." *United States v. Dawson*, 64 F. 4th 1227, 1237 (11th Cir. 2023) (quoting *Yates*, 574 U.S. at 543). Indeed, each location in subsection (c)— "building entrances, lobbies, foyers, corridors, [and] auditoriums"—refers to a location in which the public congregates but does not engage in individual, personal transactions. This is different from the Deland and other SSA offices in this case, which is where SSA conducts its primary business of assisting members of the public.

 If anything, Gray's Exhibit 4, GSA's "National Business Space Assignment Policy" further supports this distinction.[3] Its "Preface" states that it explains how the GSA "assigns, classifies, and measures space *in federally owned buildings.* [It] *does not apply to leased space*, except for buildings acquired as a portfolio lease." (Gray Exhibit 4 at 6, 12) (emphasis added). Further, the purpose of measuring, classifying, and assigning space is so GSA can "identify how many square feet to charge to the

---

[3] As noted on the record, the government did not object to the admission of Gray Exhibit 4, as long as it was the entire document (182 pages), and not the 16-page excerpt included in Mr. Gray's binder (Tr. 55). The Court confirmed that it had received the entire document by virtue of Gray's electronic submission to chambers on May 14, 2024, and was admitting the entire document into evidence (Tr. 55-56). In preparing the instant brief, the government noticed that Doc. 56-4 (Attachment to Gray Exhibit List) erroneously contains the 16-page excerpt. The government respectfully requests that the Court correct the record to include the entire document.

occupant *agencies*" (*id.* at 10) (emphasis added). The pages Gray emphasized show the distinction between "offices" which are spaces assigned to specific agencies, and building "common" and "joint use" areas which are shared by multiple agencies (*id.* at 21-42). The same goes for the diagrams he showed Mr. Flores, which were not of the Orlando or any other SSA office in this case (*id.* at 21-22; Tr. 80).

Moreover, the evidence establishes that Gray wasn't videorecording for "news purposes." As noted above, Gray began the video by saying he had just watched a video of someone "auditing" a Miami Social Security office and thought he was treated poorly (GE 1a at 0:23). "So I wanted to come out and see what they were like locally… in Deland…[and] see if they respect our rights to videorecord in public" (GE 1a at 0:57-1:19). Gray was there to challenge SSA videorecording policy; not to report on the news. *See* 41 C.F.R. § 105-60.801 (defining "news" as "information that is about current events or that would be of current interest to the public.").

### C. Count Three

Count Three charges Metz with violating section 102-74.385 on or about January 6, 2023, by failing to comply with official signs of a prohibitory, regulatory, and directory nature. This charge arises from the incident in which Metz made a videorecording inside the Ocala, Florida Social Security office. During the video, Metz enters an SSA office (GE 9 at 0:11-0:45), which Inspector Mohammed identified as the Ocala Social Security office (Tr. 178-79). Inspector Mohammed testified that he investigated this incident and that it happened in early January 2023 (Tr. 178). Although Metz is not visible during the recording, his voice is clearly

audible and matches his voice in the Kissimmee, Orlando, and Tampa recordings where his face is visible (*Compare* GE 9 at 0:50-1:17, 3:54-3:57, 4:24-5:22 *with* GE 3 at 14:30-14:33, GE 5a-5b, and GE 7a-7c). Additionally, Inspector Mohammed testified that he found the video of the Ocala incident on Metz's YouTube channel, "rogue nation" (Tr.178, 181). In turn, YouTube subscriber records confirm that "George Metz" is the owner of that channel (GE 15 at 16, 24-26, 31, 33, 38-40). Accordingly, the government has proved beyond a reasonable doubt that Metz was in or on Federal property when he videorecorded at the Ocala Social Security office.

Metz's argument that the Court should acquit him of this and the other charges because the government did not have a witness visually identify him in the courtroom is a red hearing. The Court, as factfinder in this case, observed Metz in the courtroom and can see that he is the same individual depicted in these recordings. He also identified himself as Major Lee Awesome during the Kissimmee video recording, which Gray corroborated (GE 3 at 8:25-8:54), and which is consistent with the alias he provided PSOs at the Orlando ("Major Lee Awesome") and Tampa ("Captain Awesome") Social Security offices (GE 5a at 8:12-8:18; GE 7c at 0:28-0:55). In fact, during the Orlando incident, Metz told Mr. Flores: "I've been to quite a few of your establishments here in central Florida. I go by 'Major Lee Awesome.' So they should know me pretty well." (GE 5a at 23:45-24:02).[4]

---

[4] Unlike Metz, Gray has not challenged his identity and instead elicited testimony from witnesses confirming he made the recordings of the Deland, Kissimmee, and Orlando Social Security field offices that are in evidence (GE 1a-1b, 3, 5a-5b; Tr. 64, 67, 91, 133, 186).

The evidence also establishes beyond a reasonable doubt that Metz knowingly failed to comply with official signs of a prohibitory, regulatory, or directory nature. Within two minutes of entering the Social Security office, Metz walked up to a bulletin board labeled "INFORMATION CENTER" and focused his camera on a sign that read:



(GE 9 at 2:22-2:35). Metz then focused his camera on signage containing "Rules and Regulations Governing Conduct on Federal Property," which contain the full text of

the 41 C.F.R. Part 102-74, Subpart C regulations, including 41 C.F.R. §§ 102-74.385 and 102-74.420 (*Id.* at 2:37-2:40; Tr. 179-80).

Despite clearly viewing this signage, Metz continued to record within the Ocala Social Security office for another two minutes before leaving. During this time, he remarked to another individual in the office: "Some people always like to tell other people what to do" (GE 9 at 3:54-3:57).

The fact that the PSO did not address the videorecording with Metz is of no moment. As discussed above, the government need only prove that Metz failed to comply either with signage *or* with oral directives; the regulation does not require both. *See Moriello*, 980 F.3d at 934-35; 41 C.F.R. 102-74.385. Further, the fact that the PSO did not admonish Metz regarding the videorecording does not detract from Metz's failure to abide by the written signage. It is apparent from the video that the PSO was preoccupied with trying to gain Metz's compliance with another Social Security directive he refused to follow—wearing a mask in the office (GE 9 at 0:44-1:31). Indeed Inspector Mohammed testified that during that time Covid-19 related health policies were prioritized, and that the PSO was attempting to address that issue first and did not have the chance to get to the video-recording issue (Tr. 18-19).

Additionally, when Metz entered the Ocala office, he was already aware of the Social Security policy on photography and videography. That's because in 2019 he was involved in a prohibited videorecording incident in the Tampa, Florida Social Security field office (GE 7a-7c; Tr. 169, 173). During that incident, Metz was advised by signage, a PSO, and an FPS inspector that he could not record inside a Social

Security office without prior written approval (GE 7b at 2:52-3:44; GE 7c at 0:01-2:00, 3:52-4:04; Tr. 174-75, 177-78). Like Gray, Metz brought the ORO to the Tampa Social Security office (GE 7b at 12:00, 12:31-12:41). Reading from the ORO, Metz explained to his cohorts: "It does say specifically here that 'Social Security has rules that prohibit photography and videotaping in its spaces. The prohibition must be clearly posted or actual in person be given in order to be enforced.' Now it is posted up there, and he did enforce it, so we will have to leave." (GE 7b at 12:41-13:00). Later, he added, "they do have the correct signage up" (GE 7b at 16:34-16:39). Accordingly, the evidence establishes beyond a reasonable doubt that Metz knowingly failed to comply with official signs of a prohibitory, regulatory, or directory nature when he continued to record Ocala Social Security office after viewing the signage there.

### D. Count Four

Count Four charges Metz with violating section 102-74.420 on or about January 6, 2023. This charge arises from the same incident as Count Three at the Ocala Social Security office. As above, the government has proved beyond a reasonable doubt that the defendant was in or on Federal property, and that he took one or more photographs, specifically the video at GE 9. The government has also proved beyond a reasonable doubt that Metz's videorecording of the interior of the Ocala office without written permission was prohibited by SSA security rules. As with Count Two, even if there weren't an SSA rule prohibiting videorecording, Metz still violated section 102-74.420 because he videorecorded in a space occupied by a

tenant agency (SSA) without SSA's permission. Indeed, Metz videorecorded customers seated in the waiting area (including a child); customers receiving service at service window "A"; customers entering the office; the PSO and PSO's desk, including a CCTV security footage monitor (GE 9 at 0:56-0:59; 1:56-2:09; 2:13-2:15; 3:36-3:42; 3:44-3:56, 3:59-4:22). Of particular concern, the videorecording captures an audible conversation between customers and an SSA employee conducting business at service window A (*id.* at 2:15-2:18; Tr. 180). Further, like Gray, Metz's YouTube channel and earnings records show he was video recording for commercial purposes, which required written permission from an authorized SSA official under subsection (b) (GE 13a-c, 15).

### E. Count Five

Count Five charges both Gray and Metz with violating section 102-74.385 on or about January 26, 2023, by failing to comply with official signs and the lawful direction of Federal police officers and other authorized individuals. This charge arises from the incident in which Gray and Metz both entered the Kissimmee, Florida Social Security office and each videorecorded inside. Inspector Mohammed testified that he investigated this incident and that it occurred at the Kissimmee, Florida Social Security office on January 26, 2023 (Tr. 162-64). Indeed, the video Gray recorded shows him entering through the front door to office, on which the SSA logo and "Social Security Administration 1201 E. Oak ST Kissimmee, FL 34744" is printed (GE 3 at 0:23-0:25). Inspector Mohammed further testified that the Kissimmee Social Security office is a GSA-leased space occupied solely by the SSA

(Tr. 148-49). Accordingly, the government proved beyond a reasonable doubt that Gray and Metz were in or on Federal property.

On Gray's recording, Metz can be seen entering the Kissimmee Social Security office carrying his own camera equipment (GE 3 at 1:20). PSO Diaz-Maldonado greets him at the door, points to his camera equipment, and asks: "That's off, right?" (*id.* at 1:28). Metz responds "yeah" (*id.* at 1:29). After Metz enters the office, PSO Diaz looks over Metz's shoulder at the camera and confronts him: "Sir, you've got your camera on. You cannot be recording inside the office" (GE 3 at 1:39-1:43). Metz responds "It's not recording. It's on just so I can see better because I don't have my glasses with me" (GE 3 at 1:43-1:47). Besides being facially absurd, the statement is contradicted by Metz's previous activity of video recording at the Tampa and Ocala Social Security offices. Metz told this lie because he knew from previous experience that video recording was prohibited in Social Security offices. It is a false exculpatory statement that points to a consciousness of guilt. *See, e.g.*, *United States v. Alejandro*, 118 F.3d 1518, 1521 (11th Cir. 1997); *United States v. Barresi*, 601 F.2d 193, 194-95 (5th Cir. 1979).

In fact, both Gray and Metz were on notice about the SSA's prohibition on videorecording from their prior experiences—Gray, two months earlier at the Deland office (GE 1a) and through his subsequent discussion with FPS Inspector Mohammed (GE 1b at 9:40-12:07, 13:42-13:49), and Metz, three weeks earlier via signage at the Ocala office (GE 9 at 2:22-2:40) and a few years earlier via signage, a PSO, and an FPS Inspector at the Tampa office (GE 7b at 2:52-3:44; GE 7c at 0:01-

22

2:00, 3:52-4:04)—before they even walked into the Kissimmee office. Moreover, both defendants had previously reviewed copies of the ORO noting SSA's security rules prohibiting photography and videography in its spaces (GE 1b at 9:40-12:07, 13:42-13:49; GE 7b at 12:00, 12:31-13:00; Tr. 160).

In any event, PSO Diaz reiterated the directive to Gray (as he had already done to Metz), that they could not videorecord within the Kissimmee office (GE 3 at 2:05-2:10; 3:15-3:18). He also explained several times the reason for the rule—the ability to capture the "very sensitive information" discussed at the service desks surrounding the customer waiting area (*id.* at 2:43-3:12, 6:12-6:38, 9:56-10:04). He also pointed to conspicuously posted signage in the vestibule reiterating the rule (*id.* at 2:11-2:15, 11:35-13:22). Gray disregarded the directive, responding: "I'm going to have to respectfully disagree with you" (*id.* at 3:18-3:20), and continued videorecording within the Kissimmee office for at least another eight minutes (*id.* at 3:18-11:48). Gray also relayed PSO Diaz's directive to Metz (*id.* at 4:42-4:50) (explaining that they could record in the vestibule but not inside the office), who likewise continued to record within the office (*id.* at 4:50-11:48). Accordingly, the government has proved beyond a reasonable doubt that Gray and Metz failed to comply with official signs and the lawful direction of Federal police officers or other authorized individuals when they videorecorded inside the Kissimmee office.

The fact that PSO Diaz did not physically stop Gray and Metz from recording is of no moment. At Gray's request, PSO Diaz contacted the office manager to come out and speak with Gray (GE 3 at 8:00-9:07). When PSO Diaz told Gray he would

have to wait until the manager finished his meeting, Gray responded, "I'm going to continue to record in the meantime" (*id.* at 9:08-9:16). At this point PSO Diaz understandably attempted to minimize the risk to the office by requesting that Gray and Metz at least stay away from the interview windows (*id.* at 9:16-9:20). Mr. Flores and Inspector Mohammed testified that this was consistent with how PSOs are trained to address these types of incidents (Tr. 42, 167). As Inspector Mohammed explained, "we train our [PSOs] to give actual notice... And if the individual will not comply, they're to minimize exposure to... private information as much as possible. So that's try their best to keep the individual in an area that's furthest away from the interview windows and where the SSA business is being conducted…" (Tr. 167).

### F. Count Six

Count Six charges Gray and Metz with violating section 102-74.420 on or about January 26, 2023. This charge arises from the same incident as Count Five at the Kissimmee Social Security office. As above, the government has proved beyond a reasonable doubt that the defendants were in or on Federal property; that they each took one or more photographs, specifically video recordings; and that such recordings were in violation of SSA's security rule (GE 3, 4).

Even if there weren't an SSA security rule, the defendants still violated section 102-74.420 because they videorecorded in a space occupied by a tenant agency without the agency's permission. Indeed, they videorecorded customers seated in the waiting area, a customer receiving service at service window "A" and carrying paperwork after leaving the window; the drop box area; and the PSO and his

24

workstation (GE 3 at 0:29-14:20; Tr. 165, 168). As with Deland and Ocala, which have similar layouts to the Kissimmee office, these were not subsection (c) areas.

The evidence also shows that Gray and Metz were not videorecording for news purposes. When PSO Diaz asked Gray what service he was there to receive, Gray responded "replacement card" (GE 3 at 0:47-0:54; Tr. 164). When PSO Diaz suggested that he might be able to do that online, Gray responded, "I can't do it online. I was told I had to come here" (*id.* at 0:55-1:00). By Gray's own admission, he was not there for news purposes. Unless, of course, Gray was lying, which would be evidence of his consciousness of guilt. *See Alejandro*, 118 F.3d at 1521; *Barresi*, 601 F.2d at 194-95. Later, when the defendants overheard PSO Diaz telling a customer she needed to go to the Orlando Social Security office for her SSN card issue, Metz remarked to Gray: "Seems like Orlando's the place to go [both Metz and Gray laughing]. Maybe we'll hit that next [both laughing]… that's the head hub, huh? Let's go there and rub [inaudible] with the big wigs" (*id.* at 10:05-10:40).

### G. Count Seven

As they foreshadowed at the Kissimmee Social Security office, Gray and Metz "hit" the Orlando Social Security office next—four days later, on January 30, 2023 (Tr. 167-69). Both Inspector Mohammed and Mr. Flores, the then-Assistant District Manager (ADM) for the office, testified that the office was a GSA leased space and that SSA was the sole tenant (Tr. 15-16, 148-49). Accordingly, the government proved beyond a reasonable doubt that the defendants were on Federal property.

The government also proved beyond a reasonable doubt that the defendants failed to comply with official signs and the lawful direction of authorized individuals. Gray entered the Orlando office while videorecording and promptly walked up to and zoomed in on the SSA emblem (GE 5a at 0:01-0:23; Tr. 21). He was immediately confronted by PSO Suarez, who told Gray he couldn't videorecord without permission (GE 5a at 0:23-0:31). Rather than follow PSO Suarez's lawful directive, Gray began to argue with him while continuing to videorecord, walking around the office, and capturing customers seated in the waiting area and conducting business at customer service windows (*id.* at 0:31-1:30). While this was going on, Metz entered the field office videorecording as well (*id.* at 0:34, 1:30). PSO Suarez repeated the directive to Metz that videorecording was not allowed without SSA's permission (*id.* at 2:31-2:44; 4:35-4:49). PSO Suarez also directed the defendants to the posted GSA Rules and Regulations and official signage prohibiting photography and videorecording without written consent (*id.* at 3:07-3:44; Tr. 29-30). PSO Suarez and Mr. Flores further confirmed the presence of signage at multiple other conspicuous locations in the vestibule and interior of the office (Tr. 25, 46-47).

Metz and Gray also failed to comply with the lawful directive of another PSO when they videorecorded behind two partitions, capturing yet another customer receiving service in the Social Security card center (GE 5a at 10:55-11:57; Tr. 36-37). Metz raised his video camera over the partitions and pointed it at the interview window as Gray tried to stifle his laughter (*id.* at 11:16-11:57). Both continued recording despite PSO Rivera telling them they needed to stop because of the private

26

information being exchanged there (*id.* at 11:37-11:57; Tr. 102). Metz even raised his camera over the partition again after PSO Rivera's directive (*id.*).

PSO Suarez explained that when Gray and Metz ignored his order and continued recording, he told them they could continue to record near the front door, away from the interview windows, because he was trying to de-escalate the situation and maintain safety (Tr. 89-90). PSO Suarez confirmed that he would not physically remove individuals from the office for unauthorized recording, and that he would instead contact law enforcement and await their arrival (Tr. 90, 100). PSO Suarez also confirmed that he is not authorized to grant permission to record in the Social Security office and that such permission must come from SSA management (Tr. 90, 99, 108). Both Mr. Flores and Inspector Mohammed testified that this was the appropriate approach to manage the situation and minimize risk (Tr. 76).

In any event, aside from PSO Suarez and PSO Rivera, Gray and Metz also failed to follow the lawful order of another authorized individual, Mr. Flores, the ADM for the office (Tr. 39). *See Moriello*, 980 F.3d at 935 (Immigration Judge authorized individual for courtroom over which he presided). Mr. Flores identified himself and told the defendants he had confirmed with the District Manager that they could not videorecord in the office because they had not gotten prior permission to do so (GE 5a at 18:40-19:49). When Gray responded, "I'm going to still do what I'm doing," Mr. Flores replied unequivocally, "I'm going to have to ask you to leave." (*Id.* at 19:45-19:49). Metz's retort? "Oh, you can ask. I'd like to ask you for a Lamborghini. (*Id.* at 19:49-19:53). Both Gray and Metz continued to record in the

office for another twenty minutes while Mr. Flores and the PSOs waited for law enforcement to arrive (GE 5a 19:49-30:07; GE 5b 0:01-9:51).

### H. Count Eight

Count Eight charges Gray and Metz with violating section 102-74.420 on or about January 26, 2023. This charge arises from the same incident as Count Seven at the Orlando Social Security office. As above, the government has proved beyond a reasonable doubt that the defendants were in or on Federal property; that they each took one or more photographs, specifically video recordings; and that they did so in contravention of SSA's security rule on photography and videography (GE 5a-b).

Even if there wasn't a security rule in place, Gray and Metz violated section 102-74.420 by video recording in a space occupied by tenant agency, SSA, without its permission (Tr. 39-40). Specifically, they videorecorded: customers checking in, completing paperwork, waiting for service, and receiving service; office staff, including Mr. Flores and multiple PSOs; and the PSO desk including monitors displaying security camera footage of the interior and exterior of the office (GE 5a-b; Tr. 23). Recording these monitors captured sensitive security information, including private interview rooms, back-office spaces, and security blind spots (GE 5a at 7:28-9:48; 16:23-16:42; Tr. 24, 109). They recorded in front of "Please do not stand here" signs next to the kiosk and drop box station areas, which Mr. Flores and PSO Suarez testified were posted to protect the privacy of customers using those areas (GE 5a at 2:04, 16:58; GE 5b at 9:24; Tr. 15, 110-11). Sure enough, they captured customers checking in at the kiosk (GE 5a at 2:17-2:34, 12:35-12:42, 16:45-18:36, GE 5b at

28

4:22-6:49), as well as customers carrying and completing paperwork at the drop box area (GE 5a 21:09-21:52; 5b at 2:03-2:48, 5:08-5:19).

Predictably, this bothered some customers. For example, one customer said: "I can tell you now I don't want you recording me," to which Gray responded, "Then don't talk to me" and "sue me" (GE 5a at 4:53-5:05). Another customer held up paperwork to cover her face as she walked by the camera (*id.* at 21:59-22:02).

As above, these areas where Gray and Metz recorded weren't subsection (c) areas, and Gray and Metz weren't there for news purposes. Indeed, we know from the end of the Kissimmee recording they were in Orlando because they thought they could get a bigger reaction from SSA officials. And while Gray claimed to want to "observe the flow of business at the SSA card center," he couldn't be bothered to wait in line with other patrons (GE 6a at 6:28-7:11).

## V.    <u>Conclusion</u>

For these reasons, the Court should find the defendants guilty on all counts.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:    *s/ Matthew J. Del Mastro*
Matthew J. Del Mastro
Special Assistant U.S. Attorney
USAO No. 203
400 W. Washington St., Suite 3100
Orlando, Florida 32801
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: matthew.del.mastro@usdoj.gov

U.S. v. Gray and Metz                              Case No. 6:23-mj-2348-EJK

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will notify the following CM/ECF participants:

James T. Skuthan, Esq., counsel for George Douglas Metz

Katherine L. Henry, Esq., standby counsel for Joshua Joseph Gray

I further certify that I caused a copy of the foregoing to be sent via email and United States Mail to the following non-CM/ECF participant:

Joshua Joseph Gray

By:     *s/ Matthew J. Del Mastro*
        Matthew J. Del Mastro
        Special Assistant U.S. Attorney
        USAO No. 203
        400 W. Washington St., Suite 3100
        Orlando, Florida 32801
        Telephone: (407) 648-7500
        Facsimile: (407) 648-7643
        E-mail: matthew.del.mastro@usdoj.gov