```
 1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                          ORLANDO DIVISION

 3     ............................................................
                                        :
 4     UNITED STATES OF AMERICA,        :
                                        :        Case Number:
 5            Plaintiff,                :        6:23-mj-02348-EJK
                                        :
 6     v.                               :        Orlando, Florida
                                        :        July 18, 2024
 7                                      :        10:02 AM - 11:08 AM
       JOSHUA JOSEPH GRAY,             :
 8     aka "Phocion Thegood"; and      :
       GEORGE DOUGLAS METZ,            :
 9     aka "Major Lee Awesome,"        :
                                        :
10            Defendants.               :
                                        :
11     ............................................................

12

13                      TRANSCRIPT OF ORAL ARGUMENT
                      BEFORE THE HONORABLE EMBRY J. KIDD
14                     UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21
       Audio Operator:  Julie Reyes
22     Proceedings recorded by electronic recording.
       Transcript produced by computer-aided transcription.
23
                       Electronic recording transcribed by:
24         Heather Suarez, RDR, CRR, FCRR, FPR-C, CA CSR #14538
                  (407) 801-8921 | heather@stenosuarez.com
25                  PO Box 3574, Orlando, Florida 32802
```

```
1                    A P P E A R A N C E S

2       For the Government:

3               Matthew Del Mastro, Esquire
                U.S. ATTORNEY'S OFFICE
4               400 West Washington Street
                Suite 3100
5               Orlando, Florida 32801
                (407) 648-7500
6               matthew.del.mastro@usdoj.gov

7       For Defendant Joshua Joseph Gray:

8               Joshua Joseph Gray, Pro Se
                4480 SR 44
9               New Smyrna Beach, Florida 32168

10              Katherine L. Henry, Esquire
                KATHERINE HENRY, P.C.
11              PO Box 333
                Ormond Beach, Florida 32175
12              (321) 300-3037
                katherine@restorefreedomkh.com
13              Pro Hac Vice

14      For Defendant George Douglas Metz:

15              James T. Skuthan, Esquire
                FEDERAL PUBLIC DEFENDER'S OFFICE
16              201 South Orange Avenue
                Suite 300
17              Orlando, Florida 32801
                (407) 648-6338
18              jim_skuthan@fd.org

19

20

21

22

23

24

25
```

1              **T A B L E   O F   C O N T E N T S**

2                  **July 18, 2024**

3                                           PAGE

4    ARGUMENT BY MR. GRAY ....................................6

5    ARGUMENT BY MR. SKUTHAN ...............................15

6    ARGUMENT BY MR. DEL MASTRO ............................22

7    CERTIFICATE OF REPORTER ...............................46

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **P R O C E E D I N G S**

2         (Proceedings commenced at 10:02 AM.)

3         **THE COURTROOM DEPUTY:**  Case Number 6:23-mj-2348,

4    United States of America v. Joshua Joseph Gray and George

5    Douglas Metz.

6         Counsel, please state your appearances for the

7    record.

8         **MR. DEL MASTRO:**  Good morning, Your Honor.

9    Matthew Del Mastro for the United States, and I have with me at

10   counsel's table Inspector Fareez Mohammed of the Federal

11   Protective Service.

12        **THE COURT:**  Good morning.

13        **MR. GRAY:**  Joshua Gray for Joshua Gray.

14        **THE COURT:**  Good morning.

15        **MS. HENRY:**  Katherine Henry as standby counsel for

16   Joshua Gray.

17        **THE COURT:**  Good morning.

18        **MR. SKUTHAN:**  James Skuthan for Mr. Metz.

19        **THE COURT:**  All right.  Good morning.

20        Julie, can we give a pair of headphones to the

21   individual in the back.

22        **THE COURTROOM DEPUTY:**  Yes.

23        **THE COURT:**  All right.  Okay.  So we are here

24   today -- primarily, I wanted to allow the parties an

25   opportunity to respond to the posttrial briefing that was

1    filed.  I'd initially planned to proceed -- well, make a ruling

2    on those motions and -- and then, if appropriate, proceed to

3    sentencing.  But after reviewing the motions, I might not make

4    a ruling today because I do want to hear your responses to

5    those motions, and I might take them under advisement.

6              So why don't we begin with responses to the --

7    sorry -- to the briefing.  I have read the briefing; so you

8    don't need to spend a lot of time summarizing the briefing, but

9    I do want to hear your responses to the arguments made by

10   opposing counsel.

11             So why don't we start with the defendants.  Mr. Gray,

12   would you like to go first, or would you like Mr. Skuthan to go

13   first?

14             **MS. HENRY:**  As a procedural matter, Your Honor, if I

15   may ask a question.

16             **THE COURT:**  Go ahead.

17             **MS. HENRY:**  The -- our understanding was that in

18   being prepared for today that each of the parties were supposed

19   to essentially prepare a combination of either just kind of

20   summarizing what they felt like their main points were with

21   responses to the other briefs, and so that's what Mr. Gray has

22   done, and so it's a combined thing.  I don't know if he could

23   really parse out --

24             **THE COURT:**  That's fine if he wants to do that since

25   Mr. Gray is proceeding pro se.

1          All right.  Go ahead.

2          **MR. GRAY:**  Thank you, Your Honor.  May it please the

3     Court.

4          I'd like to begin by apologizing to the Court by

5     extending my brief by five pages.  I didn't understand until

6     that submission that the United States' motion was only

7     applied -- applied to -- to them.

8          **THE COURT:**  That's okay.

9          **MR. GRAY:**  Your Honor, I'd like to spend the next

10    15 minutes or so discussing the United States' brief, if I

11    could begin by asking why the United States didn't answer

12    perhaps the most important question to this case: Your Honor's

13    question.  There's also the question of news purposes and what

14    defines news purposes.

15         I believe there is already a mountain of reasonable

16    doubt, but Your Honor asks a critical question.  The case

17    precedent referenced in my brief makes clear it is clearly

18    established that not only does everybody have freedom of press

19    rights but, further, the press and the people have the same

20    right of access.

21         Supreme Court decision *Houchins v. KQED*,

22    Justice Potter Stewart stated, "That the First Amendment speaks

23    separately of freedom of speech and freedom of press is no

24    constitutional accident but an acknowledgment of the critical

25    role played by the press in American society."  He wrote, "The

1    Constitution requires sensitivity to that role and to the

2    special needs of the press in performing it effectively."

3          The United States -- the fact that the United States

4    ignored this question during their brief is of little surprise.

5    They made no mention of it during -- they made no mention of

6    Subsection (c) of the CF -- pardon me -- 41 C.F.R. 102-74.420

7    at any point during the trial.  Its absence from their brief

8    raises reasonable doubt.

9          In the United States' elements of charged offenses

10   beginning on page 1, Your Honor, did the United States

11   establish at any point during the trial which signs are

12   official and which ones are not?

13         The U.S. inserted a picture of a sign on page 18 of

14   their brief.  It's Government Exhibit 9, 2:22 to 2:35.  We know

15   beyond a shadow of a doubt that this sign is unofficial because

16   it says, "Social Security policy prohibits taking pictures."

17   During trial we established that no such policy exists.  I

18   think it is disingenuous for the United States to reference

19   that as some authority when we know this is not an official

20   sign.

21         On page 9, another accusation that I failed to comply

22   with official signage.  No authority from GSA or SSA ever made

23   mention of what an official sign was and what wasn't -- of --

24   made mention of what was an official sign and what wasn't.

25         On page 28 he makes mention of a sign that said,

1    "Please don't stand here."  Your Honor, this is what my good

2    friend would call -- my good friend Dan would call "laminator

3    law."  These are not official signs, and it is obvious.

4            The United States referenced two guilty verdicts in

5    their brief.  In the *Stamps* case, the Honorable Sarah Hays

6    stated in her ruling on page 5, line 24 to 25 continuing on to

7    lines 1 and 2 of page 6:  "And the Court has reviewed the

8    videotape, as I've mentioned several, several times.  And it is

9    clear that the defendant was allowed to film -- was -- was able

10   to film the entrance, the foyer, the lobby areas where people

11   were sitting."

12           In the *Cordova* case, I would just like to note that

13   this building sounded like it had a particularly unique layout.

14   The Honorable Michael Hegarty actually noted on page 7 of his

15   verdict:  "Under a different set of facts, where a person might

16   enter the outdoors directly from" -- "into a federal office,

17   the outcome could be different.  There" -- "there was a

18   distinct entry from the outdoors, corresponding with a

19   Subsection (c) space, which after a set of interior doors

20   leading to a distinct and unmistakable office space,

21   corresponding with Subsections (a) and (b)."

22           This is that different set of facts, Your Honor.  All

23   parties have stipulated that I was never in an area that wasn't

24   open to the general public.  I never enter nor is it alleged

25   that I enter any office space.

1    Your Honor -- Your Honor, I mention in my brief, but

2    I would like to touch on it again because the United States

3    made mention -- made mention that social security offices are

4    nonpublic forum.  In *Price v. Garland*, "The United States

5    argues that the syllogism" -- "the syllogism proceeds from

6    a" -- "from a flawed major premise because not every" -- "not

7    every activity the First Amendment protects as speech benefits

8    from the strict speech-protective rules of the public forum.

9    Because the filmmaker does not seek to communicate with others

10   at the location in which he or she films, the filmmaker does

11   not use that location as a forum.  Therefore, the United States

12   argues, the district court's forum analysis was misplaced."

13   We think the Government is correct.  Based upon the

14   historical underpinnings of the forum analysis, the evolution

15   of the analytical framework, and the cases in which the Supreme

16   Court has applied it, we are convinced that it would be a

17   category error to apply the speech-protective rules of a public

18   forum to a regulation of an activity that merely -- that

19   involves merely a noncommunicative step in the production of

20   speech.  Although that activity warrants solicitude under the

21   First Amendment, that solicitude does not come from the

22   speech-protective rules in the public forum.

23   In reaching this conclusion, we are buoyed by the

24   Supreme Court's warning against extending the public forum

25   doctrine in a mechanical way to the extents that meaningfully

1    differ from those in which the doctrine was traditionally

2    applied.  *Arkansas Education Television Communication* [sic]

3    *v. Forbes*, 1998, Your Honor.

4              We must remember that I never spoke to anyone that

5    didn't speak to me first.  My intent was to silently film.

6              On page 6 of the United States' brief, Mr. Del Mastro

7    says that Social Security has a rule.  We have proven beyond a

8    shadow of a doubt that this is not the case.  Social Security

9    has no such rule.  The United States never introduced a rule

10   into evidence.  He goes on to say that the rule is the sign.

11             Your Honor, 41 C.F.R. 101-1.110, Deviation:

12             "In the interest of establishing and maintaining

13   uniformity to the greatest extent feasible, deviations -- the

14   use of any policy or procedure in any manner that is

15   inconsistent with the policy or procedure prescribed in the

16   Federal Property Management Regulations -- are prohibited

17   unless such deviations have been requested from and approved by

18   the Administrator of the General Services or his authorized

19   designee.  Deviations may be authorized by the Administrator of

20   the General Services or his authorized designee when doing so

21   will be in the best interest of Government.  Request for

22   deviations shall clearly state the nature of the deviation, the

23   reason" -- "the reasons for such a special action."

24             Any "no recording in the lobby" policy is prohibited

25   without a deviation, which was never introduced into evidence

1    and doesn't exist.

2         On page 7 the U.S. continues:  "While the POMS," the

3    policy for the Social Security, "does not have the force of

4    law, it can be persuasive."  I agree, but we should not

5    conflate an audio-recording policy that affirms that right into

6    an antirecording -- anti-video-recording policy that simply

7    does not exist.

8         The U.S. argues:  "The fact that the Social Security

9    rule is not set forth in its own regulation is of" -- "is of no

10   moment.  The plain language of the Section 102-74.420 does not

11   require the promulgation" -- "the promulgated regulation or any

12   other particular form," C.F.R. 102-74.420, "except where

13   security regulations, rules, orders, or directives apply."

14   Mr. Del Mastro gave special emphasis to the word "or" in "or

15   directives."

16        But directives are not merely the random whims of

17   Government agents.  The GSA defines a directive as "An internal

18   directive is a policy or a guideline that is issued by the

19   federal agency for its employees to follow.  GSA internal

20   directives provide clear guidance on how to carry out specific

21   tasks or procedures.

22        "Internal directives cover topics such as personal

23   policies, information, security protocols.  They are often used

24   in response to changes in laws or regulation or to address

25   specific issues or challenges faced by the agency.

1  "Internal directives are an important tool for the

2  GSA to ensure that employees are following consistent and

3  effective procedures that are" -- "that they are working in

4  compliance with federal laws and regulation.  The official

5  versions of all internal directives are stored here in the GSA

6  Directives Library."  This is from GSA.gov.

7  No directive from the SSA to the GSA was shared in

8  discovery nor did we see one entered into evidence.

9  On page 8 the United States argues that since SSA has

10  been violating citizens' rights for so long, they should be

11  able to continue to do so.  No, thank you, sir.

12  We've identified a problem, and we either need to

13  make the proper changes through the official deviation process,

14  or the United States needs to step in line and do what it swore

15  to do, which was uphold our rights, not attempt to violate them

16  with impunity.

17  On page 13 we have the operational readiness order

18  that says, "SSA has rules that prohibit photography and

19  videotaping."  We have established that SSA has no such rule.

20  This only raises more doubt and highlights the apparent poor

21  communication between these government agencies.  Bureaucracy

22  has created this trial of strained logic and mental gymnastics,

23  Your Honor.

24  The Government would have us believe that the

25  tenant -- the tenant agency can print up a sign, slap it on a

1   wall, and call it a security directive and ignore the GSA

2   regulations and the GSA desig- -- deviation process.

3   Apologies.  For a few reasons, we know this to be untrue.

4               First, the regulation 41 C.F.R. is written in the

5   plain language and next to the maxim what's not included is

6   excluded.  And while there is -- is a cutout for a court order

7   or a rule, there is not a cutout for a tenant agency rule or

8   directive.

9               The only logical reading of the 420 disallows tenant

10  agency rules, or else tenant agencies could just slap signs on

11  the wall to get around the GSA regulations -- to get around the

12  GSA regulations they don't like, say, like a "recording in the

13  lobby" policy, for example.

14              Without a deviation, the GSA rules require security

15  regulations, orders, rules, or a directive or a federal court

16  order.  These are official actions that are backed by, at the

17  very least, some basic printed documentation, some actual

18  evidence that they exist.

19              The recent *Loper* decision takes the deference

20  historically given under the *Chevron* doctrine to the Government

21  and restores it to the Court.  Judicial deference to agency

22  rulemaking under *Chevron* was incompatible with the Court's

23  fundamental duty to interpret the law.

24              On page 16 the United States enters my mind and

25  states that I was there to challenge the SSA video-recording

1   policy, not report on the news.  Your Honor, we have

2   established beyond any reasonable doubt that no such policy

3   exists for me to challenge.  Instead what I was there to do was

4   see if the people who swore to uphold my rights would honor

5   their oaths.  The news in this case is that people charged with

6   securing our rights have absolutely no issue violating them

7   because "I was just following orders."  There is nothing more

8   newsworthy.

9           Your Honor, in closing, the question we must ask

10  ourselves is why didn't the Government produce any leases at

11  trial that confirmed that we were an agency space?  Why did

12  they not subpoena the GSA leasing agent from next door that's

13  literally connected to this building?  The Government could

14  have had that one witness come in, review the video, confirm

15  each space was tenant agency space, and what could I have said?

16          Instead, in our case -- in the two unpublished cases

17  provided by the United States, Your Honor will notice a trend

18  in all of them.  In no case has the Government provided

19  evidence showing that these lobbies are tenant space.  On the

20  other hand, we have submitted the GSA space assignment manual

21  which without a doubt shows that in no way possible are the

22  common areas ever assigned to the tenant agency.

23          Lastly and quite possibly most importantly,

24  Your Honor, is *Smith v. the City of Cumming*, the Eleventh

25  Circuit decision in 2000.  "The First Amendment protects the

1   right to gather information about what public officials do on

2   public property and, specifically, a right to record matters of

3   public interest."  To argue that reporting on the behavior of

4   public officials is not in the public interest is, frankly,

5   absurd.

6           For these reasons and those cited in my motion to

7   dismiss, the trial and in my brief highlight much more than a

8   mere introduction of reasonable doubt.  It is for these reasons

9   that I humbly ask Your Honor to find me not guilty of all

10  charges.

11          THE COURT:  All right.  Thank you, Mr. Gray.

12          Mr. Metz -- well, Mr. Skuthan for Mr. Metz.

13          MR. SKUTHAN:  Good morning.

14          THE COURT:  Good morning.

15          MR. SKUTHAN:  Your Honor, I didn't want to forget

16  about the pending motion for judgment of acquittal; so I

17  incorporated that in what I filed with the Court.

18          At the conclusion of all the evidence, the defense,

19  meaning Mr. Metz, move for a judgment of acquittal as to

20  Counts 3, 4, 5, 6, 7, and 8.  Those are the counts that

21  Mr. Metz was charged with.  And then at the conclusion of the

22  entire case, another motion for judgment of acquittal was made.

23          I understand that a judgment of acquittal -- the

24  Court has to resolve all inferences in favor of the Government,

25  and we're not asking the Court to do anything other than that.

1   But we did point out in our briefing as well as ore tenus, in

2   fact, when we did the trial that the Government called many

3   witnesses to the stand.  There wasn't a witness that identified

4   Mr. Metz as the one who committed the acts alleged in the

5   information filed in this case as to Counts 3, 4, 5, 6, and 7

6   and 8.

7           In the Government's response, it indicates that

8   that's not necessary, that there's enough evidence to establish

9   that Mr. Metz was the person named in the information.  We

10  disagree with that.  If that was the case, then there would

11  never be a necessity of a witness to testify as they do in

12  every trial that the person sitting at counsel table is the

13  person that is named in the indictment or in this case the

14  information.

15          So we think -- even though the Court must resolve the

16  evidence in the light most favorable to the Government, we

17  think that the Government has not established identity as to

18  Counts 3, 4, 5, 6, 7, and 8 as to Mr. Metz, and we'd ask that

19  the Court grant a judgment of acquittal on that ground.

20          Secondly is the issue of venue.  Obviously, the case

21  must be tried in the district where these actions occurred.  So

22  just like with identity in any trial, a witness is called and

23  asked the question, "Did these acts that you testified about --

24  where did they take place?"  And then the witness will usually

25  say they took place in the Middle District of Florida, thereby

1  establishing venue for the proper location for the trial.  That

2  was not done in this case, and the judgment of acquittal was

3  raised as to that issue as well.

4          I know the Government responded that there was enough

5  evidence from the record to indicate that the actions occurred

6  in the Middle District of Florida.  Again, we don't think

7  that's sufficient to carry the day, and we'd ask that the Court

8  grant the judgment of acquittal based on venue as well.

9          Now, the Court asked the parties to answer three

10 questions; so I'll turn to the first one, which appears to be

11 the easiest one, and that is one that the parties do not

12 disagree, as to whether or not videotaping -- in response to

13 the Court's first question, which was "Does photographing

14 include videotaping?"  So both Mr. Metz and Mr. Gray and the

15 Government says that photograph does include video.  So I think

16 that question doesn't need any further conversation because

17 everyone is in agreement with that.  That's not to say that the

18 Court's in agreement with that, but at least the parties are in

19 agreement with that.

20         Looking to the third -- next to the third question is

21 whether or not these are news organizations.  I think quite

22 clearly they are.  I would say that Mr. Metz is not necessarily

23 part of a traditional news organization as we knew it perhaps

24 growing up, but posting things on the Internet nowadays is news

25 just like anything else.  The fact that perhaps some income was

1   earned is not -- does not defeat that claim.  I mean, the *New*

2   *York Times* turns a profit too.  If they didn't, their

3   stockholders would be very upset.

4           The -- I think Mr. Gray first pointed out that the

5   videotaping of police action, particularly in the Rodney King

6   case, which everyone is familiar with, served a valuable and

7   important public purpose.  I think most people would agree that

8   was a valuable and important public purpose because we saw

9   pretty much for the first time police officers beating a man

10  senseless who did nothing more than get out of his car, and I

11  think everyone would agree that was a valid public interest

12  what was done.

13          We can disagree as to whether or not we agree it

14  was -- filming in a social security office has the same weight

15  and import, but that's something that reasonable people can

16  differ on.  Social Security is a government agency.  They must

17  perform according to their rules and regulations, and the fact

18  that someone decides to go in there, in a place where they

19  lawfully have a right to be, and videotape is not -- while it

20  may not be the same importance as the Rodney King incident, it

21  still is important to let the public know what's going on in a

22  government agency.  And they're answerable to the people, and I

23  think that's well established.

24          What strikes me in this case is particularly the

25  testimony of -- going to Question Number 2, on Counts 7 and 8,

which was dealing with the Orlando social security office, the

Government called a witness, Mr. Flores, who is the manager of

the Orlando social security office.  And Mr. Flores was very

open and honest about his testimony.  He indicated that the

social security office is open to the public and that people

that are members of the public, even if they're not citizens,

not only have a right to be there, but in this case they had

been given permission to videotape.

On page 6 and 7 of our response, we take some of the

transcript from the -- excuse me -- from the trial.  And

Mr. Flores was asked, "You -- you were asked about the type of

people that come into the social security office.  Do you

remember that?"

He said, "Yes."

"In truth, any citizen can go into the social

security office?"

He said, "Citizen or not, any person can come to the

office."

"They have a right to be there?

"Yes, they do.

"And in this instance there were two individuals that

came in that we've been discussing?

"Yes, they were.

"Do they have a right to be there?

"Yes, they were," and then talked about the filming.

1    And he said, "The guard said so long as there's no sensitive

2    information, it's okay to record," and he said he agreed with

3    that.

4            So this is a gentleman who worked there, I believe,

5    14 years.  He agreed that they were told they have a right to

6    film there, that they had a right to be there; and, if nothing

7    else, I think there's -- there's a vagueness issue in the sense

8    of how is an ordinary citizen supposed to know exactly what to

9    do to conform to the law if Mr. Flores, who was quite candid

10   and quite honest, who had been in that office for 14 years,

11   indicated that he believed that they had been told that they

12   could film and that that was okay.  So I think that's very

13   important to consider.

14           With respect to Counts 3 and 4, which Mr. Gray was

15   not charged in those counts, I'd ask the Court to take

16   particular attention to the facts in that -- in that case which

17   are much different than perhaps the other counts.

18           In the Ocala case, the guard on duty did not tell the

19   person in the -- in the office that he could not film.  The

20   person was in there for a short amount of time.  The only thing

21   the guard said was you have to put a mask on.

22           I know the United States did not charge the second

23   part of that statute in Count 4, I believe it is -- or,

24   actually, Count 3.  But, nonetheless, the proof on Counts 3 and

25   4 is very scant compared to the proof in Counts 5, 6, 7, and 8.

1    And, again, we're saying there's not enough evidence as to any

2    of the counts but particularly with regard to Counts 3 and 4.

3           We also would like to adopt any arguments made by

4    cocounsel because I think in many ways both Mr. Metz and

5    Mr. Gray are similarly situated except for the fact that

6    Mr. Gray is charged with Counts 1 and 2 and Mr. Metz is charged

7    with Counts 3 and 4, which Mr. Gray is not charged.

8           If I could have a moment?

9           **THE COURT:**  Sure.

10          **MR. SKUTHAN:**  And as indicated by Mr. Gray in his

11   statement to the Court, I'll reiterate, as Mr. Metz has asked

12   me to do, that the Government would have you believe that a

13   tenant agency can just print a sign and slap it on a wall and

14   call it a security directive and ignore the GSA regulations and

15   the GSA deviation process.  As Mr. Gray indicated, for reasons

16   we know now to be untrue, the first regulation of 41 C.F.R. is

17   written in plain language, and next is the maxim what is not

18   included is excluded.  And while there is not an out -- while

19   there is an out for a court order or a rule, there is no out

20   for a tenant agency rule or directive.  The only logical

21   reading of 420 disallows for tenant agency rules or else tenant

22   agencies could just, again, put signs on the wall to get around

23   GSA regulations they don't like, like the recording in the

24   lobby, for example.

25          So, in summary, I would say that the Court has seen

1   the evidence.  We've all seen the evidence.  The persons that

2   were in the buildings clearly had a right to be there,

3   according to Mr. Flores.  They were filming.  They were told in

4   several of the instances that it was okay to record, and I

5   think they fit within the exemption because they were working

6   for a news agency.  Although it's not a traditional news

7   agency, they were working as news agencies.

8           So we'd ask that the Court acquit Mr. Metz of

9   Counts 3, 4, 5, 6, 7, and 8 as well as the grant of our motion

10  of judgment of acquittal as to those counts as well.  Thank

11  you.

12          **THE COURT:**  Thank you.

13          All right.  Mr. Del Mastro, tell me how -- let's

14  assume for present purposes -- and you'll get to make your

15  argument without my assumption.  But let's assume for present

16  purposes that I do think they were recording for news purposes.

17  Tell me under that assumption how they're guilty of violating

18  these regulations at issue.

19          **MR. DEL MASTRO:**  Yes, Your Honor.  They're guilty in

20  two ways under the regulation.

21          The first is the initial clause, we'll call it, of

22  Section 420 which says "except where security regulations,

23  rules, orders, or directives prohibit it."  That is exactly

24  what the case is here.  We don't even get to the rest of the

25  regulation because Social Security had a security rule or

1    directive in place prohibiting photography and video recording

2    in its offices without prior written permission of the agency

3    and --

4              THE COURT:  And where was -- so, specifically, which

5    ones are you talking about?  Which directive are you talking

6    about?

7              MR. DEL MASTRO:  Your Honor, I'm talking about the

8    directive that is posted in social security signage at each of

9    the facilities --

10             THE COURT:  Okay.

11             MR. DEL MASTRO:  -- that's displayed in the video

12   recordings.

13             THE COURT:  So it is the position of the

14   United States that those signs are -- do count as a directive

15   under the regulation?

16             MR. DEL MASTRO:  That's correct, Your Honor.  And, in

17   fact, as -- as I cited in my brief, that went beyond even

18   what's required.

19             THE COURT:  But tell me how -- because the regulation

20   allows -- has an exception for news purposes, which, to me,

21   would indicate that in fashioning this regulation, First

22   Amendment rights of news organizations were taken into account.

23             Is it your position that whomever printed the sign --

24   I don't know who printed the sign -- whomever presented the

25   sign saying no recording at all, that that trumps the

1    consideration that's found in the C.F.R.?

2            MR. DEL MASTRO:  It doesn't trump it, Your Honor, and

3    I think that's the -- that's the primary point here.  The

4    Social Security security directive goes hand in hand with this

5    regulation.  The regulation says "except where there is such a

6    rule, order, or directive in place."  Then it -- then it sets

7    out particular --

8            THE COURT:  So then it's your position that the

9    Social Security Administration could post a sign that doesn't

10   take into account First Amendment rights at all and a violation

11   of that would lead to criminal penalties?

12           MR. DEL MASTRO:  I'm not saying that at all,

13   Your Honor.  The social security --

14           THE COURT:  Perhaps tell me how, then, that sign

15   accommodates any First Amendment rights of the press or

16   individuals.  Now I'll let you answer that question.

17           MR. DEL MASTRO:  Thank you, Your Honor.

18           So this is a nonpublic forum.  This is a social

19   security office where social security business is conducted.

20   It has never been opened up to public discourse as a -- as a

21   public forum or even a limited public forum.  Because it's a

22   nonpublic forum, the agency can -- can implement restrictions

23   on expressive activity so long as it's reasonable, and

24   reasonableness goes back to the purpose of the restriction and

25   the agency's reason for having that restriction.

And as I articulated in my brief, social security offices are conducting necessary business with individuals from the public regarding very sensitive personal rights to benefits and -- and social security numbers, so very important particularized business that depends on very sensitive information.  And so Social Security -- it having this rule against video recording and photography in this space is taking into account the risk -- the high level of security risk that the PII, personally identifiable information, that's being discussed, either verbally or exchanged on paper, could be captured by someone else who is there video recording or taking photos.

It also, as I -- as I set forth in my brief, it has a chilling effect.  Individuals need to go into social security offices to conduct certain social security business, and there's a chilling effect if when they go in there they could be subject to other members of the public recording them or taking photos of them.

And we saw that evidence in the recordings.  We saw individuals who confronted the defendants about not wanting to be recorded.  We saw individuals covering their faces with paper so they wouldn't be seen on these recordings.  We saw other individuals with kind of confused expressions on their face, not sure where to go.  There's -- in the Orlando recording, there's a woman who's standing around holding

1    paperwork who eventually goes over to the self-service drop box

2    area to complete that paperwork, but for a while she's glancing

3    over because the defendants are standing in front of that area

4    doing video recording.

5            So the Social Security Administration -- as -- as

6    Mr. Flores testified, in his 15 years of experience working out

7    of the social security field offices all the way up to district

8    manager, Social Security has a very strong interest in

9    protecting -- protecting individuals' privacy in conducting the

10   necessary business in that office.  And so this is a reasonable

11   restriction that Social Security has put into place to protect

12   that information and protect the individuals needing to conduct

13   business there.

14           And I think it's important -- as Mr. Flores set out,

15   there are easy ways for individuals who want to report on the

16   news or who want to report on the functioning of a social

17   security field office to do that.  Nothing prohibits them from

18   going into that office, observing how the office functions,

19   observing wait times, things like that, taking brochures and

20   pamphlets which are in the office.  I thought that was an

21   interesting exchange on cross-examination where Mr. Flores was

22   being probed on the ability of individuals to go in and take

23   video or photos of pamphlets of brochures, and he responded,

24   "Why wouldn't they just -- no.  I'd tell them they can't do

25   that.  They could just take the brochure.  The brochure is

1    there to take."

2         On top of that, Social Security's policy provides an

3    opportunity for photography and video recording.  It says "with

4    the express written consent of the agency."  So nothing

5    prevented --

6         THE COURT:  Well, well, well, now we're mixing things

7    up again because you just said that the signs trump -- the

8    signs govern whatever happens in that building.  The signs

9    don't say, "No recording except with permission of the Social

10   Security Administration."  They say, "No recording," and your

11   representation to me is that that is the directive that I

12   should consider when -- when making my ruling.

13        MR. DEL MASTRO:  Your Honor, respectfully, the signs

14   say -- the big lettering on the signs is "No photography or

15   video recording," and then it says underneath "Express" --

16   "except with the express written consent of the agency."

17        THE COURT:  All of the signs say that?

18        MR. DEL MASTRO:  Yes, Your Honor.  The ones that say

19   "Silence your phone" that have the picture of, like, a woman on

20   it -- it says "Silence Your Phone.  No recording" in there, I

21   don't think that -- it says it on that, but certainly the signs

22   in the vestibule entering the office said that, and the ones

23   that the defendants zoomed their cameras in on when they were

24   recording say that.  And I believe those were also captured in

25   the photographic exhibits that the Government admitted.

1          So a -- like on page 18 of the Government's brief,

2     this is the sign in the Ocala field -- social security field

3     office that Mr. Metz recorded:  "Photography and videography

4     prohibited.  Federal law and SSA policy prohibits taking

5     pictures or video inside SSA offices without the express

6     written consent of an authorized official of the agency."

7          And I highlighted in the DeLand social security

8     office -- in Mr. Gray's venture, he zoomed in on the language

9     on the -- essentially the same sign saying, "Photography and

10    videography prohibited," and he read that.  But, actually, if

11    you look lower on the sign, it has the same small print about

12    the ability to obtain authorization from the agency.

13         And, in fact, Mr. Flores engaged the defendants about

14    that when he came out and said that they did not have

15    permission but that he could give them the contact information

16    for the regional public affairs office for the Social Security

17    Administration so that they could request permission to do

18    that, but they didn't want to hear that.

19         So, Your Honor, what the social security-specific

20    sign does is it memorializes the well-established practice by

21    the Social Security Administration in its social security

22    offices banning photography and video recording without prior

23    written consent of the Social Security Administration.  That

24    policy is also referenced in the POMS.  But, again, as I cited

25    in my brief, there is no requirement under the First Amendment

1   that it be a promulgated regulation.  In fact, I cited several

2   cases where the practice at issue that was restricting the

3   expressive activity was a completely unwritten practice or

4   policy.

5          Here we have the signage putting the defendants on

6   notice about the practice and policy.  It was also referenced

7   in the social security POMS, which is publicly available.  So

8   this case -- the Social Security Administration goes beyond

9   what was required under law -- under First Amendment law.  And

10  there's no question that the defendants were on notice about

11  this, Your Honor.  They both came equipped with the DHS

12  operational readiness order.  Mr. Metz had it as far back as

13  2019 when he went into the Tampa social security office and was

14  informed of all of these rules, both by signage, by a PSO, by a

15  Federal Protective Service inspector.  And Mr. Gray went in

16  with the same operational readiness order when he went to the

17  DeLand office and referenced it.

18         And that -- that order sets forth exactly this point,

19  that Section 420 provides circumstances where video recording

20  or photography can be allowed in certain federal offices but --

21  but except where there is a prohibition on it and so that --

22  the operational readiness order says, "Here.  Here's an example

23  of that.  The Social Security Administration has rules that

24  prohibit photography and video recording in social security

25  offices."  And, again, it's for good reason.  As virtually all

1    of the Government witnesses testified, it's because there's

2    this large exchange of personal information that goes on in

3    that office that could be captured by photography or video

4    recording in those spaces.

5           So the social security rule on video recording and

6    photography is not at odds in any way with

7    41 C.F.R. 102-74.420.  In fact, it's an example of an agency

8    having a security regulation, rule, or directives that applies

9    to that space.  So we don't get to news purposes.  We don't get

10   to Subsection (a), (b) or (c).  We don't have to even go there.

11          But the Government's position is even if we were to

12   go beyond that because Your Honor were to find that there --

13   there weren't a social security rule, order, or directive

14   prohibiting the activity that we're talking about a space

15   occupied by a tenant agency.

16          And I know we -- the defendants have argued that,

17   well, the Government should have gotten -- should have put the

18   lease in evidence or should have had a leasing official come

19   testify.  That's not necessary.  Your Honor could see through

20   your plain eyes and from the testimony of the witnesses who did

21   testify that this was a social security office.  There's

22   nothing else going on in this space.  This is a stand-alone

23   social security office.  The witnesses testified there were no

24   other occupant agencies in there, no other businesses, no other

25   federal government agencies.  It was just the social security

1    office.  So that's -- and that it was leased by -- through the

2    GSA.

3            So Social Security Administration is the tenant

4    agency there.  That's a space occupied by a tenant agency.  So

5    however you cut it under Subsection (a) or (b), the defendants

6    needed permission to record in there.  The Government's

7    position is they needed written permission because they were

8    engaged in a commercial activity.  They were making money off

9    of these video recordings.  But either way, they didn't have

10   verbal -- even if it's considered noncommercial purposes, they

11   didn't have verbal authorization.

12           And I know the defendants make much of the fact that

13   the PSOs attempted to minimize the disruption and the violation

14   of the rule when the defendants refused to listen to them and

15   their directives by saying that they could record in that back

16   area by the door away from the more sensitive areas of the

17   office.  That's not permission, Your Honor.

18           In fact, the defendants had already violated the

19   regulations.  They went into these offices, and the PSOs told

20   them promptly -- and I have it set forth in my brief all of

21   those time stamps -- that they couldn't record in there, that

22   they didn't have permission to record.  They had to leave.

23   They had to stop recording.  And the defendants refused to

24   leave.  I mean, that was a violation right there of the orders

25   of the PSOs.  It was a violation of the -- of Section 420 as

1    well.  The fact that the PSOs didn't physically remove the

2    defendants and instead called law enforcement or FPS, which the

3    defendants didn't wait to arrive in most of the cases, that's

4    not permission to record in there.  The defendants were told

5    they could not record without permission, and they continued

6    recording.

7           The same thing with the Orlando office.  Although the

8    PSOs tried to minimize the disruption by telling the

9    defendants, "Just stay back here.  Stay away from the -- the

10    security areas," after they didn't listen to -- to the PSOs'

11    initial directive, Mr. Flores came out and told them they could

12    not record in there, and they continued to record after

13    Mr. Flores told them they couldn't record.

14           So they did not have permission numerous instances in

15    both -- in all of the recordings where they did not have

16    permission to record in those spaces, and they did so; and the

17    guards' attempts to minimize the risk to the office, minimize

18    the damage to the office should not be construed as -- as

19    permission.

20           So, Your Honor, the -- the -- Subsection (c)'s news

21    purposes portion is not an exception to the generalized rule in

22    420.  Again, if there's a security rule, order, directive,

23    regulation for that space, there's what controls.  If

24    Your Honor finds that there is no such security rule or

25    order --

1    **THE COURT:**  Before you move on, I do have one

2    additional follow-up.

3    So it's not shown on your excerpt on page 18, but I'm

4    looking at one of the exhibits.  Regardless, there is a sign

5    that says what you have, but below that it says

6    41 C.F.R. 102-74.420.  So what would be your argument that

7    someone who sees that should not assume that it's incorporating

8    what's found in the C.F.R. and including the exception for news

9    purposes?

10   **MR. DEL MASTRO:**  Well, it does incorporate it,

11   Your Honor, in that -- it's like the basis for it, which is

12   that 41 C.F.R. 102.74-420 provides in its first sentence that

13   such a prohibition can exist; so --

14   **THE COURT:**  I guess -- sure.  I understand that

15   reading of it, but the average, ordinary person goes in, they

16   see this citation, they look it up, and then they see an

17   exception for news purposes.  How would that not be, I suppose,

18   a reasonable interpretation of the sign?

19   **MR. DEL MASTRO:**  Because the -- on top of the

20   signage, the defendants then entered the office and were

21   instructed by PSOs as -- and by Mr. Flores in the other office

22   to remove any sort of question or doubt about this sign that

23   "Yes, this policy applies, and you are in a social security

24   office space where there is no carve-out to allow you without

25   permission to record in here.  This is all a social security

1    space.  You cannot record or -- or take photos in here without

2    permission."

3           And, again, I keep going back to defendants had the

4    operational readiness order with them in their first visits to

5    the social security office as -- Mr. Metz back in 2019 and

6    Mr. Gray in the DeLand office in November of 2022.  And they

7    were -- it was explained to them -- this is exactly -- the

8    operational readiness order is memorializing this very concept,

9    that an agency, like the Social Security Administration, can

10   have a security-related order, rule, or directive that -- that

11   restricts recording that essentially does exactly what the

12   first sentence of 420 says it can do, and that's what's --

13   that's what's happening here.

14          THE COURT:  All right.

15          MR. DEL MASTRO:  This is not a case, Your Honor,

16   where the -- where the defendants go into the vestibule, they

17   read this sign, they go in, they start recording off the good

18   faith that "Okay.  I've looked up this sign, and I've looked at

19   this regulation, and I'm concluding that this space that I'm

20   stepping into this office space where business is conducted --

21   I'm still concluding that this is a lobby, and therefore I can

22   record in here," and they're being charged off of that.

23          They were confronted by PSOs and informed that "No.

24   Like, you are reading this wrong.  This -- the requirement in

25   this office is you cannot record or take photos without written

1    permission," and the defendants refused to accept that, and

2    they continued to record.  It's not a case where the

3    Government's charged someone who looked this up in the

4    vestibule, walked in, and was recording -- was informed, "No.

5    What this means is X," and then said, "Okay.  I misunderstood,"

6    and leaves.  That's not what's been charged here.  These

7    defendants have been informed time and time again about the

8    specific rules governing social security field offices and

9    those office spaces.

10            THE COURT:  All right.  And I think you're about to

11   make your argument about why the -- this was not done for news

12   purposes.

13            MR. DEL MASTRO:  Your Honor, I think -- well, right

14   before I get to that point too, I think, again, the recordings

15   that happened in this space -- and I cite this in -- in my

16   brief.  The examples that are given in 420 -- the lobbies,

17   quarters, auditoriums -- that that's not what -- that's not the

18   area in the recordings that were done here.

19            I think it's noteworthy that even in the *Stamps* case,

20   which I appended to my brief, where the Court conceded that

21   "Okay.  Even conceding that this area that these -- that this

22   defendant was standing in was a lobby, the defendant proceeded

23   to take photographs or videos of things that were not the

24   lobby."  They took photographs of customers waiting for

25   service.  They -- or video of customers waiting for service,

1    video of the PSO, video of the customer service desks, the

2    windows where customers were receiving business.  That's

3    exactly what happened here too.

4            So even if Your Honor were to conclude that "Okay.

5    The area that they're standing in is a lobby under

6    Section (c)," they are video recording other things, in this

7    case all the things I just mentioned: zooming in and recording

8    the CCTV monitor on the PSO's desk, pointing cameras through

9    partitions or over partitions to avoid -- to -- to record

10   private interviews happening at service windows.

11           So even under the -- the *Stamps* conclusion that those

12   spaces -- that that space where they were standing in was a

13   lobby, they went beyond that in what they recorded.  I -- the

14   Government disagrees with the Judge's conclusion there that

15   that was a lobby.  The Government's position is that area --

16   that these social security offices -- this is all an office

17   space.  This is distinguishable from the federal building

18   scenario that -- that Inspector Mohammed testified about,

19   different from the -- the manual -- the GSA property manual

20   that Mr. Gray set in evidence, which, as -- as the Government

21   set forth, throughout that manual you can see that that is

22   distinguishable -- everything about that is distinguishable

23   from this case and what's going on here.  Those are all spaces

24   where there are multiple federal agencies sharing common areas

25   where business is not conducted.

1    THE COURT:  But if it's being done for news purposes,

2    does that distinction matter?

3    MR. DEL MASTRO:  It does matter, Your Honor.  It

4    does, yes.

5    THE COURT:  Tell me why.

6    MR. DEL MASTRO:  So even conceding that -- that this

7    was a news purpose -- that this was for news purposes, this,

8    again, it would be -- it would be saying -- it would be (a) or

9    (b).  All roads lead back to (a) or (b) if you find that

10   there's not a rule of order because they were in a space

11   occupied by a tenant agency.  If they were doing it for news

12   purposes, they didn't have permission to do it.

13   THE COURT:  Well, to me that reads out -- why even

14   have a separate provision for news purposes if it's -- I mean,

15   the regulation could have been easily written to say -- I mean,

16   the other two sections start with "space occupied by a tenant

17   agency."  They could have said, you know, in (c) "building

18   entrances, lobbies, foyers, corridors, auditoriums for news

19   purposes except in space occupied by a tenant agency."  To me

20   this seems like this regulation is going for something broader.

21   So I read this as saying that even if it is a space

22   occupied by a tenant agency, if it is a building entrance,

23   lobby, foyer, corridor, or auditorium, it can be done for news

24   purposes.  So tell me why that's incorrect.

25   MR. DEL MASTRO:  I think that's incorrect,

1    Your Honor.  I agree with the way the Court in the *Cordova*

2    case, which is the other -- the other decision that I appended

3    to my brief, that drawing the distinction between -- you know,

4    applying the doctrine noscitur a sociis, this idea that groups

5    in a list should be construed together and for their common

6    purpose -- we're talking about entrances, lobbies, foyers,

7    corridor, auditorium.  As the judge pointed out there, these

8    are all areas where business is not being conducted.  These are

9    areas where -- and that's why I go back to the example -- the

10   federal -- a federal building example.

11          Again, a federal building that has a lot of these

12   spaces -- auditoriums, corridors, lobbies -- where members of

13   the public come in.  There's no business being conducted in

14   that area.  That's a generalized shared space from spaces

15   occupied by tenant agencies, which are areas, as -- as the

16   judge in *Cordova* pointed out, where agencies conduct their

17   primary business of assisting, well, whatever their primary

18   business is.  Here it's -- for the Social Security

19   Administration, it's -- it's assisting the public.

20          So, again, we're talking -- these are different

21   areas.  That's -- Subsection (c) is trying to memorialize those

22   areas where agency business is not conducted which generalized

23   areas that members of the public can enter who are maybe going

24   to seek business or do something else in -- in a particular

25   area.  These are generalized areas where people can gather.

1    And that makes sense in this context too.  Again,
2    these are -- contrasting these two areas, these are areas
3    where -- where members of the public have less of an
4    expectation of privacy -- in the lobby of a federal building,
5    as you're entering in there, or in an auditorium watching some
6    presentation -- as opposed to going to a social security office
7    to conduct your business in which you're bringing personal,
8    private documents that are required to prove your identity and
9    establish your business in that area and you're discussing that
10   business there as opposed to, again, these generalized areas.
11            **THE COURT:**  Do you think it's a bit vague, though?
12   Because if you're reading this and you say -- see building
13   entrance, a lobby -- I think most people have a general
14   conception of what a lobby is or a foyer.  I don't really think
15   corridors or auditoriums are really at issue here.  But a
16   building entrance or lobby or foyer -- an average person is
17   reading that.  I suppose your response is going to be that
18   these are not the average people interpreting this regulation,
19   but -- but if you were to just tell somebody you can record in
20   the lobby, and they walk into the social security building
21   down -- down the road and they enter, and they're like, "Oh,
22   this is the place where I wait to be called.  This is the
23   lobby.  I can record here," I mean --
24            **MR. DEL MASTRO:**  Well, again, Your Honor, I go back
25   to this is not the case where someone goes into the office

1    under the mistaken idea that "Okay.  This is a lobby.  I can --

2    I can record here."  These defendants were specifically

3    informed that, "No.  You need to look at the first clause of

4    this regulation, that this is a social security office where

5    this entire area is a social security office where social

6    security business is being conducted."

7            Even just the process of checking in to this office

8    requires the dissemination of personal information.  Social

9    security has a specific rule that prohibits photography and

10   videography for good reason.  This is different than a lobby in

11   a generalized federal building with multiple tenant agencies

12   where there's no business being conducted.  This is not the

13   case where, again, that person said, "Okay.  Like, I understand

14   now that there's a difference or SSA has this rule."  This is

15   the defendants refused to accept that.

16           THE COURT:  Sure.

17           MR. DEL MASTRO:  Your Honor, lastly, with news

18   purposes, as you can see -- the Court doesn't even need to get

19   there, whether this was news purposes in this case.  I don't

20   contest -- I cited in my brief another subsection of 41 C.F.R.,

21   so the 41 group defining, kind of, news and which actually

22   mirrors the one that's cited by Mr. Metz on page 8 of his

23   brief, 45 C.F.R., which is DHS regulation on freedom of

24   information.  I don't dispute that definition of news or news

25   purposes.

1    I think in these cases, as I set forth in my brief,

2    the purpose that becomes clear when you watch these -- these

3    video recordings is the defendants enter the social security

4    offices because they didn't like the social security policy and

5    they wanted to change that.  They weren't there to -- to gather

6    newsworthy items.

7    In fact, in some instances -- I mean, we either take

8    them at face value for why they were there or what they told

9    the officers -- "Oh, I need an SSN replacement card" -- or they

10   were lying.  Mr. Metz entered clearly video recording and told

11   the guard he wasn't recording and that he was -- when the guard

12   noticed that it actually was recording and confronted him,

13   Mr. Metz said, "Oh, I'm not recording.  I'm using this to help

14   me see better," which, I mean, is just facially a lie.  And it

15   goes to consciousness of guilt too.

16   So the defendants were there to confront the SSA

17   policy that they didn't like, to -- as you can see, to try to

18   either embarrass or get in conflict with the officers who

19   confronted them and then post that information online.  They

20   weren't there to cover the news at the office and actually see,

21   "Okay.  How is this social security office actually

22   functioning?" and that sort of thing.  And, again, there were

23   mechanisms for them to do that, and that's not what was going

24   on here.

25   But, again, Your Honor does not need to -- to reach

1   this question.  Even taking the broadest view of "Okay.  They

2   weren't there to cover the news.  They were there to make the

3   news and then cover their own news-making activities."  That's

4   fine because it still was not allowed in this space where they

5   recorded.

6               THE COURT:  All right.  Thank you.

7               MR. DEL MASTRO:  One moment, Your Honor.  I'm just

8   making sure --

9               THE COURT:  Go right ahead.

10              MR. DEL MASTRO:  -- I addressed everything.

11              Your Honor, briefly, I addressed on the -- in my

12  response on the judgment of acquittal arguments -- Mr. Metz's

13  argument is that "Well, in every case the Government has a

14  witness identify the defendant sitting in the courtroom."

15  Well, not every case has video recordings capturing the

16  criminal conduct.  It's not necessary here.  Your Honor can --

17  can see and hear those video recordings and -- and observe the

18  defendants in this courtroom.

19              Similarly, there is no requirement whatsoever for the

20  Government to elicit testimony from a witness that this

21  incident happened in the Middle District of Florida.  The

22  Government elicited testimony that these incidents each

23  happened in cities in the Middle District of Florida --

24  Orlando, Ocala, Kissimmee, and DeLand.  Your Honor is well

25  aware, as the Court must be, of -- of its jurisdiction and the

1    cities encompassed by the Middle District of Florida.  The

2    Government's elicitation of evidence showing that these events

3    all happened in cities within the Middle District of Florida is

4    more than sufficient to -- to establish venue here.

5           The last thing I'll say, a lot of Mr. Gray's brief

6    addresses -- and his citation to *Smith* -- in reliance on *Smith*

7    *v. Cumming* from the Eleventh Circuit relies a lot on just

8    different scenarios that aren't applicable to this case --

9    recordings of police activities in public fora.  Again, not --

10   not this case, not what was going on here, entering nonpublic

11   fora and video recording against restrictions that were in

12   place.

13          I will note, especially for the *Smith v. Cumming*

14   case, the Eleventh Circuit in *Crocker v. Beatty* has called into

15   question even the extent to which the *Smith v. Cumming* should

16   be interpreted and construed.  It was like a two- or three-page

17   decision, which the Eleventh Circuit later noted in *Crocker* and

18   *Beatty* [sic] was really unhelpful in the facts and

19   circumstances of the case to -- to be able to really merit any

20   guidance going forward.  The Court noted that based on the

21   limited discussion in that case and the time, place, and manner

22   of discussion that the -- it appeared too that the Court was

23   dealing with a traditional public or limited public forum and

24   not a nonpublic forum.

25          **THE COURT:**  Thank you.

1    All right.  Well, this has given me a lot to think

2    about, and I do want to take the parties' arguments under

3    advisement.  I want to go back and look at some of these cases

4    more in depth and some of the exhibits that we've discussed.

5    So I'm not going to rule on these issues today.  I will notice

6    a separate hearing at which -- so the next time you appear

7    before me, I will issue a ruling on the pending motions and, if

8    appropriate, will have sentencing on that date.

9         I'm not going to set that date today, but we will

10   notice it on the docket sufficiently in advance for the parties

11   to prepare for the hearing, and be sure to check the docket for

12   that date.

13        **MS. HENRY:**  Your Honor.

14        **THE COURT:**  Yes.

15        **MS. HENRY:**  I -- if it were anything else, I would

16   just move it on my end, but to the extent that it would

17   prohibit me from being here, I do want to let the Court know

18   that I have some cancer-related surgery dates coming up for

19   myself, and those are all in August.  So if you were looking at

20   going out that far, I do have those dates --

21        **THE COURT:**  It will probably not be in August.  More

22   likely September just based on my calendar.  So if -- I will

23   notice the hearing.  If you have a conflict with one of those

24   dates for any conflict, but particularly if it's a medical

25   purpose, just file a motion to continue.  In fact, before I set

1    the date, I'll probably just ask my CRD to coordinate with

2    everybody to make sure it's a date that works for everyone, and

3    we'll just handle it that way.

4              MS. HENRY:  Thank you, Your Honor.

5              THE COURT:  All right.  All right.  Is there anything

6    else from the United States today?

7              MR. DEL MASTRO:  No, Your Honor.  Thank you.

8              THE COURT:  From Mr. Gray?

9              MR. GRAY:  No, Your Honor.  Thank you.

10             THE COURT:  Mr. Metz?

11             MR. SKUTHAN:  No, Your Honor.  Thank you.

12             THE COURT:  All right.  Thank you, everyone.  These

13   arguments were helpful; so I do appreciate your making them

14   today, and this hearing is adjourned.

15        (Proceedings concluded at 11:08 AM.)

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

1

2

3    I, HEATHER SUAREZ, RDR, CRR, FCRR, FPR-C, CA CSR,

4 DO HEREBY CERTIFY that the foregoing is a correct transcription

5 of the official electronic sound recording of the proceedings

6 in the above-titled matter.

7

8    DATED this 30th day of July 2024.

9

10       _____

11        Heather Suarez
      Registered Diplomate Reporter
12      Certified Realtime Reporter
     Federal Certified Realtime Reporter
13   Florida Professional Reporter-Certified #790
   California Certified Shorthand Reporter #14538

14

15

16

17

18

19

20

21

22

23

24

25