UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No: 6:23-mj-2348-JSS-UAM

JOSHUA JOSEPH GRAY and
GEORGE DOUGLAS METZ,

Defendants.
_______________________________________/

**OPINION**

The Defendants, Joshua Joseph Gray, proceeding pro se, and George Douglas Metz, appeal from the judgments, (Dkts. 84, 85), entered against them by the magistrate judge. (Dkts. 89, 93.) The Defendants filed initial briefs challenging their convictions, (Dkts. 108, 115), and the Government responded, (Dkts. 116, 117). Although the court ordered the Defendants to submit reply briefs by July 11, 2025, (Dkts. 107, 113), they did not do so and, to date, have not filed reply briefs in this appeal. Upon consideration, the court affirms the Defendants' convictions.

**BACKGROUND**

In November 2023, the Defendants—who consider themselves citizen journalists and First Amendment auditors, (*see* Dkts. 55-22 to 55-27; Dkts. 108, 115)—were charged by information with eight petty offense counts based on four incidents of filming in Social Security Administration (SSA) field offices, which occurred on November 16, 2022, and January 6, 26, and 30, 2023. (Dkts. 1 to 3; *see* Dkt. 35 at 4; Dkt. 36 at 2; Dkt. 40 at 3–4, 6–7.) Counts one and two charged Mr. Gray with violating regulations 41 C.F.R. § 102-74.385 and 41 C.F.R. § 102-74.420, respectively,

in connection with the November 16, 2022 incident. (Dkt. 1 at 1–2.) Counts three and four charged Mr. Metz with violating sections 102-74.385 and 102-74.420, respectively, in connection with the January 6, 2023 incident. (*Id.* at 2.) Counts five and six charged both Defendants with violating the sections in connection with the January 26, 2023 incident, (*id.* at 3), and counts seven and eight charged both Defendants with violating the sections in connection with the January 30, 2023 incident, (*id.* at 4–5).

When the Defendants were convicted, section 102-74.385 provided: "Persons in and on property must at all times comply with official signs of a prohibitory, regulatory, or directory nature and with the lawful direction of [f]ederal police officers and other authorized individuals." 41 C.F.R. § 102-74.385. Further, at that time, section 102-74.420 stated:

> Except where security regulations, rules, orders, or directives apply or a [f]ederal court order or rule prohibits it, persons entering in or on [f]ederal property may take photographs of . . .
>
> (a) [s]pace occupied by a tenant agency for non[]commercial purposes only with the permission of the occupying agency concerned[,]
>
> (b) [s]pace occupied by a tenant agency for commercial purposes only with written permission of an authorized official of the occupying agency concerned[,] and
>
> (c) [b]uilding entrances, lobbies, foyers, corridors, or auditoriums for news purposes.

41 C.F.R. § 102-74.420. After the Defendants were convicted, sections 102-74.385 and 102-74.420 were removed as duplicative of 6 C.F.R. §§ 139.30 and 139.65, respectively. *See* Federal Management Regulation; Conduct on Federal Property, 91

Fed. Reg. 2316, 2316–17 (Jan. 20, 2026); Protection of Federal Property, 90 Fed. Reg. 4398, 4401 (Jan. 15, 2025).

In December 2023, during the initial appearance and arraignment hearing in this case, the magistrate judge appointed counsel for Mr. Metz and permitted standby counsel to appear pro hac vice for Mr. Gray. (*See* Dkt. 27.) The Defendants also pleaded not guilty and were released on their own recognizance. (*See* Dkts. 10 to 19.) The day after the hearing, the magistrate judge entered a scheduling order setting the case for a bench trial and requiring the Government to file a statement of the elements of the crimes against the Defendants. (Dkt. 21 at 1.) The statement of the elements listed two elements for a section 102-74.385 violation: (1) "[t]he [D]efendant was in or on [f]ederal property" and (2) "[t]he [D]efendant knowingly failed to comply with official signs of a prohibitory, regulatory, or directory nature[] or with the lawful direction of [f]ederal police officers or other authorized individuals." (Dkt. 24 at 1.) The statement of the elements listed three elements for a section 102-74.420 violation: (1) "[t]he [D]efendant was in or on [f]ederal property," (2) "[t]he [D]efendant took one or more photographs," and (3) the photograph or photographs were "prohibited by security regulations, rules, orders, or directives[] or by a [f]ederal court order or rule," were "of a space occupied by a tenant agency for non-commercial purposes without the permission of the occupying agency," or were "of a space occupied by a tenant agency for commercial purposes without the written permission of an authorized official of the occupying agency." (*Id.* at 1–2.)

In March 2024, Mr. Gray moved to dismiss the charges against him with prejudice. (Dkt. 35.) With regard to the section 102-74.385 counts, he contended that any directive to stop filming could not serve as the basis for the counts because the directive "would have been unlawful and a violation of [his] First Amendment rights." (*Id.* at 5.) Mr. Gray explained: "I was never in any restricted area at any time. The flow of business was never hindered by my presence. I limited all of my news[]gathering activities to the public entrances, lobbies, foyers[,] and corridors." (*Id.*) With regard to the section 102-74.420 counts, he argued that he "was in strict compliance with" section 102-74.420(c) "[i]n [his] capacity as a member of the [p]ress." (*Id.* at 4.) Mr. Gray supplemented his motion with support that he filmed as a representative of the news media. (*See* Dkts. 36, 37.) In response to Mr. Gray's motion, the Government maintained that the information was facially sufficient and that Mr. Gray's arguments "relate[d] to the nature and sufficiency of the evidence and application of the regulations to this case—all of which require[d] development of a factual record at trial." (Dkt. 40 at 1.) The magistrate judge agreed with the Government and denied the motion. (*See* Dkt. 45.)

The bench trial commenced on May 16, 2024, and concluded the following day. (Dkts. 61, 62.) At the beginning of the trial, the Government introduced twenty-six exhibits into evidence without objection. (Dkt. 55; *see* Dkt. 61 at 5–6.) These exhibits included video footage and photographed signage from SSA offices in Deland, Ocala, Kissimmee, and Orlando, Florida, as well as YouTube screenshots and financial records and administrative materials. (Dkt. 55.) The video evidence generally

portrayed the Defendants entering the SSA offices while videorecording and also captured business conducted in the offices. Excerpts from the video footage were played during the trial as witnesses testified. (Dkt. 61 at 20–23, 25, 28–29, 31–32, 34–35, 38–39, 41–46, 87–88, 100–02, 104, 109–11, 114, 125–33, 139, 153–56, 159–60, 162–65, 167–68, 173–81; Dkt. 62 at 13.) The Deland and Ocala signage cautioned: "Federal law and SSA policy prohibit[] taking pictures or video inside SSA offices without the expressed written consent of an authorized official of the agency," (Dkts. 55-5, 55-17), and "Personal electronic devices (cell phones, cameras) may not be used to take photographs or to make video recordings," (Dkts. 55-6, 55-18). The Kissimmee and Orlando signage likewise warned that photography was prohibited. (Dkts. 55-8, 55-12.) The YouTube screenshots showed the profiles for the accounts This is a Public Service and rogue nation, (Dkts. 55-22 to 55-27), and the YouTube financial records linked Mr. Gray to the former account and Mr. Metz to the latter, (Dkts. 55-28, 55-29). The administrative materials indicated the SSA's policy on taping interviews in field offices—as reflected in Program Operations Manual System (POMS) GN 03360.010—and the Federal Protective Service (FPS)'s policy on photographing and videotaping federal facilities—as stated in Operational Readiness Order HQ-ORO-002-2018. (Dkts. 55-20, 55-21, 56-1.) POMS GN 03360.010 provided: "Photography and video[]recording are prohibited in [f]ederal space without the permission of the tenant agency (41 U.S.C. § 102-74.420)." (Dkt. 55-20.) The Operational Readiness Order provided: "SSA has rules that prohibit photography and videotaping in its spaces. . . . The prohibition must be clearly posted or actual (in-person) notice must be

given in order to be enforced." (Dkt. 56-1 at 3.) After introducing the above exhibits, the Government called its first witness. (Dkt. 61 at 6–8.) In total, the Government called four witnesses: Luis Flores with the SSA, Protective Security Officers (PSOs) Pierre Suarez and Kimberly Davenport, and FPS Inspector Fareez Mohammed. (Dkts. 49, 61, 62.)

An assistant district manager for the Orlando, Florida SSA field office in January 2023, (Dkt. 61 at 8–9, 14), Mr. Flores provided background about SSA field offices in general and the Orlando office in particular and testified about a January 2023 incident there that involved the Defendants, (*id.* at 8–15). Drawing from over a decade of experience working for the SSA, Mr. Flores described the general nature of a field office and the individuals who sought assistance there, called customers, (*see, e.g.*, *id.* at 15, 17, 19), and he noted that the customers regularly provided personally identifiable information (PII) including Social Security numbers (SSNs) and medical records. (*Id.* at 8–14; *see id.* at 26–27, 37.) Mr. Flores also testified about the layout of the Orlando office. (*Id.* at 14–15.) With respect to SSA policies, Mr. Flores stated that he typically relied on POMS guidelines. (*Id.* at 17.) Focusing on the SSA policy on photography and videorecording inside field offices, Mr. Flores testified that such photography and videorecording were prohibited for reasons related to privacy and security and that signage clearly indicated the prohibition. (*Id.* at 17–18.) As to the January 2023 incident, Mr. Flores testified that the Defendants took video inside the Orlando office, including footage depicting Mr. Flores, and posted the video on YouTube. (*See id.* at 19–20.)

As Mr. Flores explained, the video showed Officer Suarez at a guard station with sensitive security information, (*id.* at 22–24), and it showed customers seeking assistance, presumably using PII, (*id.* at 32–33, 38, 44). The video also displayed a poster directing individuals not to use cell phones to videorecord in the office, (*id.* at 25), as well as "the standard signage that [was] posted in every [SSA] office about no video[]recording . . . and no photography in the [SSA] office," (*id.* at 30). Mr. Flores testified that signage prohibiting videorecording also appeared in bulletin boards at the Orlando office's entrance. (*Id.* at 46.) According to Mr. Flores, he confirmed that the Defendants had not received permission to record inside the office. (*Id.* at 40.) Mr. Flores also stated that the Defendants' videorecording did not aid the flow of business at the office but caused distractions, disturbances, and disruptions to service, for example by taking officers away from their stations to address the videorecording. (*Id.* at 42, 45, 63.) During Mr. Gray's cross-examination of Mr. Flores, Mr. Gray introduced two exhibits into evidence without objection: a document dated November 2005 describing Federal Management Regulation, Title 41, Code of Federal Regulations, Part 102-74, Subpart C, from General Services Administration (GSA) Rules and Regulations Governing Conduct on Federal Property (Dkt. 56-2) and a document including diagrams and descriptions of government office spaces (Dkt. 56-3).[1] (*See* Dkt. 61 at 52–56.) Mr. Flores testified that the latter exhibit did not depict the Orlando field office. (*Id.* at 80.)

[1] To clarify, Mr. Gray submitted a 16-page excerpt from the document including diagrams and descriptions of government office spaces (Dkt. 56-3), and the Government opposed admission of the excerpt but did not oppose admission of the entire 182-page document. (Dkt. 61 at 55.) As the

Officer Suarez, the PSO on duty at the Orlando office during the incident there, (*id.* at 86–87), testified about the SSA policy on videorecording inside field offices and about the incident. (*Id.* at 86–114.) He stated that his primary duties as a PSO were to "maintain public safety and [to] enforce Title 41" regulations, (*id.* at 86; *accord id.* at 93), and that in his approximately eight years as a PSO, (*id.* at 85), he had been trained on the regulations through logbooks and post orders, (*id.* at 93). Regarding the policy at issue, Officer Suarez testified that photography and videorecording were prohibited inside SSA field offices unless the individual seeking to photograph or videorecord secured authorization to do so from the SSA office's manager. (*Id.* at 86–87, 95–97, 99, 105, 108.) According to Officer Suarez, at the time of the trial Mr. Flores was the assistant to this authorizing official. (*Id.* at 108–09; *see id.* at 99.) Officer Suarez indicated that as a PSO, he, personally, could not authorize anyone to videorecord; only management could. (*Id.* at 90.) Officer Suarez also stated that when unauthorized videorecorders entered an SSA field office, PSOs were not to remove them from the office but to wait for "the proper authorities" to resolve the situation. (*Id.*) Regarding the incident at issue, Officer Suarez testified that the Defendants took

magistrate judge had an "electronic copy of the entire document" on the USB drive that also contained the video evidence (the Ex 4 or Ex 6 file in the Defendant Joshua Gray's Exhibits folder), the magistrate judge admitted "the entire document . . . as an electronic exhibit." (*Id.* at 55–56.) In post-trial briefing, the Government noted that the record contained the 16-page excerpt as opposed to the entire document. (Dkt. 68 at 15 n.3.) The court observes that the document in its entirety is available online. *See* GSA Pub. Bldgs. Serv. Off. of Portfolio Mgmt. & Customer Engagement, National Business Space Assignment Policy, U.S. Gen. Servs. Admin. (Aug. 2023), https://www.gsa.gov/system/files/NBSAP%20August2023%20FINAL_508.pdf. The magistrate judge did not rely on the document to find the Defendants guilty. (*See* Dkt. 77.)

video inside the Orlando office, including footage depicting Officer Suarez, and then posted the video on YouTube. (*Id.* at 87–88.)

Officer Suarez indicated that signage on the wall in the Orlando office generally prohibited videorecording, (*id.* at 94–95; *see id.* at 96–97, 107), and that the Defendants did not obtain authorization from SSA management to record, (*id.* at 90). According to Officer Suarez, consistent with the signage, he initially instructed the Defendants that they could not record in the Orlando office but they disregarded this instruction and continued to record. (*Id.* at 89.) In an effort to deescalate the situation, Officer Suarez stated, he told the Defendants that they could record in certain parts of the office; however, he advised them to avoid locations with sensitive information, which he considered to be restricted areas. (*Id.* at 89–90, 109.) Officer Suarez testified that during the incident, the Defendants—Mr. Gray in particular—inhabited restricted areas such as a table near a drop box where SSA customers had sensitive documents. (*Id.* at 91–92.) Officer Suarez further testified that he explained about the drop box table during the incident. (*Id.*) In addition, he stated that monitors at his desk displayed closed-circuit television (CCTV) footage of the office and that the Defendants' videorecording of the monitors posed a security concern. (*Id.* at 109.) When asked about the Defendants' effects on SSA business, Officer Suarez explained that the Defendants' videorecording disrupted business by confusing customers and prompting some customers to cover their faces to remain unrecorded. (*Id.* at 101–03, 111, 113–14.) He also explained that Mr. Gray's camera occupied space on a table that customers would otherwise have used to place documents. (*Id.* at 105.)

According to Officer Suarez, signage reading "Please do not stand here" next to the drop box table, along with other tables, aimed to keep customer traffic flowing smoothly, but the Defendants disregarded the signage, thereby further disrupting SSA business. (*Id.* at 110–11.)

After Officer Suarez testified, the magistrate judge resolved an evidentiary dispute. (*Id.* at 115–19.) The Government sought to admit three videos of an uncharged incident involving Mr. Metz that occurred in November 2019 in an SSA field office in Tampa, Florida. (*Id.* at 115–16; *see* Dkts. 55-13, 55-14, 55-15 (Gov't Exs. 7a, 7b, 7c).) The Government had noticed the videos under Federal Rule of Evidence 404(b) and indicated that it sought their admission to show Mr. Metz's "knowledge of the . . . prohibition on photography" and videorecording inside SSA offices and "his intent to violate" the prohibition. (Dkt. 24 at 3.) According to the Government's Rule 404(b) notice, the videos demonstrated that Mr. Metz was aware of the prohibition when he videorecorded inside SSA offices on the dates stated in the indictment. (*Id.*) During the trial, the Government described the incident depicted in the videos: Mr. Metz entered the SSA field office in Tampa to videorecord in there, was advised by signage, PSOs, and an FPS officer about the policy prohibiting photography and videorecording in SSA offices, acknowledged that he understood the policy, and left. (Dkt. 61 at 116.) The Government argued that the videos supported the knowledge elements of Mr. Metz's offenses and that they served permissible purposes related to knowledge and absence of mistake. (*Id.* at 116–17.) Mr. Metz objected to the videos under Rules 403 and 404(b). (*Id.* at 117–18.) He maintained that the danger of unfair

prejudice substantially outweighed the videos' probative value because SSA offices in different Florida cities, for example Tampa and Ocala, interpreted and enforced regulations differently. (*Id.*) The magistrate judge overruled the objections, explaining that prejudice was not as much of a concern in a bench trial as in a jury trial and that the video evidence was admissible to prove Mr. Metz's knowledge. (*Id.* at 118–19.)

The Government's next witness was Officer Davenport, the PSO on duty in the Deland, Florida SSA office during the incident there in November 2022. (*Id.* at 122, 124.) Officer Davenport's testimony concerned the SSA policy against videorecording inside field offices, as well as the incident. (*Id.* at 122–140.) She testified that she had approximately five years of experience as a PSO and that her primary duty in that role was to enforce Title 41 regulations, including the prohibition on videorecording. (*Id.* at 122–23.) According to Officer Davenport, unless an individual obtained the prior written permission of the SSA, the individual was prohibited from videorecording in SSA offices, even in the foyers and entranceways, due to the large amount of personal information shared in the offices. (*Id.* at 123–24, 127, 130–31, 134.) As to the November 2022 incident, Officer Davenport stated that after Mr. Gray entered the Deland office while videorecording, she informed him that he could not videorecord in the office and she pointed him to signage stating the prohibition. (*Id.* at 124, 133.) According to Officer Davenport, Mr. Gray nonetheless continued to record. (*Id.* at 124–30.) She explained that in addition to filming the signage, he filmed SSA customers receiving and waiting to receive assistance. (*Id.* at 126–29.) Officer Davenport testified that Mr. Gray also filmed her desk area, where members of the

general public were not permitted, where logbooks and post orders were kept, and where monitors displayed CCTV footage of the office's exterior and lobby. (*Id.* at 128–29.) Officer Davenport stated that she confirmed with SSA management that Mr. Gray did not have permission to take video of the Deland office's interior. (*Id.* at 130.) She indicated that the video, which included footage depicting her, was posted on YouTube. (*Id.* at 125.)

Inspector Mohammed, the Government's final witness, provided extensive testimony respecting his investigation into the Defendants. (*Id.* at 141–216; Dkt. 62 at 3–19.) He testified that for the offices at issue, the SSA was the sole occupying agency, and he contrasted the SSA offices with buildings occupied by multiple agencies, which featured lobbies, foyers, corridors, and similar shared areas that buildings occupied by a single agency, like the SSA field offices, lacked. (Dkt. 61 at 149–50, 202; Dkt. 62 at 14, 16–17.) He provided background on FPS, PSOs, and the SSA policy against videorecording inside field offices. (Dkt. 61 at 142–48, 164, 167, 174–75, 202–03; Dkt. 62 at 6.) He also described the Deland, Ocala, Kissimmee, and Orlando incidents forming the basis of the charged offenses. (Dkt. 61 at 151–68, 178–81; Dkt. 62 at 12, 17–19.) In addition, he explained that through his investigation, he learned about the uncharged Tampa incident involving Mr. Metz and obtained information about the Defendants from YouTube. (Dkt. 61 at 169, 173–74, 181–96; Dkt. 62 at 15.)

An FPS officer for nearly a decade at the time of the trial, Inspector Mohammed testified that he had worked in Central Florida since 2021 and was the primary FPS inspector for the region. (Dkt. 61 at 142, 144, 146–48.) He explained that his FPS

duties included enforcing Title 41 regulations for the SSA and that SSA PSOs worked under FPS contracts as extensions of FPS law enforcement. (*Id.* at 144–45, 147–48.) Inspector Mohammed indicated that all SSA PSOs had the same authority and duties with respect to enforcing the regulations. (*Id.* at 164, 174–75.) Regarding the policy generally prohibiting videorecording in SSA offices, he testified that the FPS trained PSOs to provide actual notice of the policy to individuals seeking to record and also trained them to minimize the exposure of personal information if individuals continued to record despite notice of the policy. (*Id.* at 167.) Although individuals could record if they had permission, Inspector Mohammed clarified, "in all instances, written permission would be required." (Dkt. 62 at 6.) He further testified that signage prohibiting videorecording was consistent throughout all of the SSA offices at issue. (Dkt. 61 at 203.)

As to the Deland incident in mid-November 2022, Inspector Mohammed testified that the day after Mr. Gray recorded in the Deland office, Inspector Mohammed met with Mr. Gray in the office's parking lot to discuss Title 41 regulations. (*Id.* at 151, 154–55.) According to Inspector Mohammed, during the meeting Mr. Gray handed him the Operational Readiness Order received into evidence (Dkt. 55-21). (Dkt. 61 at 154–57.) At trial, Inspector Mohammed opined that the Operational Readiness Order was consistent with the SSA's videorecording prohibition and with Officer Davenport's conduct during the incident. (*Id.* at 159.) As to the Ocala incident on January 6, 2023, Inspector Mohammed testified that the PSO on duty did not instruct Mr. Metz to stop videorecording because the PSO prioritized

a pandemic-related masking requirement over the videorecording prohibition and because Mr. Metz left before the PSO had an opportunity to mention the videorecording prohibition. (Dkt. 62 at 12, 17–19.) Inspector Mohammed also testified that he watched video of the Ocala incident on YouTube and that the video showed SSA customers as well as signage stating the prohibition. (Dkt. 61 at 178–81.) As to the Kissimmee incident on January 26, 2023, Inspector Mohammed stated that the PSO on duty allowed the Defendants to record in certain areas of the SSA office in accordance with the FPS training to minimize exposure to personal information when individuals did not comply with the videorecording prohibition. (*Id.* at 162–65, 167.) Inspector Mohammed also discussed the Orlando incident, which involved both Defendants and occurred on January 30, 2023. (*Id.* at 167–68.)

Inspector Mohammed testified that during his investigation, he discovered the 2019 Tampa incident involving Mr. Metz. (*Id.* at 169.) He stated that he watched video of the incident on YouTube and that the video showed signage indicating the videorecording prohibition. (*Id.* at 173–74; *see* Dkt. 62 at 15 ( "[T]he individuals involved in the Tampa incident . . . in 2019 . . . were shown . . . the [Title 41] signage and the no[-]recording directives that were posted." ).) Inspector Mohammed's investigation also produced information related to YouTube. (Dkt. 61 at 181–96.) He explained that he subpoenaed YouTube's parent company to obtain records for the accounts that featured video of the incidents at issue: the This is a Public Service and rogue nation YouTube accounts. (*Id.* at 181–86.) Further, he explained, he noted information posted on the accounts' profiles, took screenshots, and viewed other

videos there. (*Id.*) According to Inspector Mohammed, the subpoenaed records identified the Defendants as the accounts' owners and contained information about the posted videos, the Defendants' earnings from the videos, and subscribers. (*Id.* at 186–96.) Inspector Mohammed's testimony linked Mr. Gray to the This is a Public Service YouTube account and Mr. Metz to the rogue nation YouTube account. (*Id.* at 181.) During Inspector Mohammed's cross-examination by Mr. Gray, Mr. Gray introduced into evidence, without objection, a memorandum that discussed activities protected under the First Amendment. (*Id.* at 214.)[2]

After Inspector Mohammed's testimony concluded, the Government rested its case-in-chief. (Dkt. 62 at 19.) The Defendants then moved for judgments of acquittal under Federal Rule of Criminal Procedure 29. (*Id.* at 19–30.) The magistrate judge reserved decision on the motions in anticipation of additional briefing by the parties. (*Id.* at 25, 30.) The Defendants thereafter rested their cases-in-chief and renewed their

[2] Mr. Gray submitted two exhibit lists in advance of the trial, but he attached exhibits to only the second list. (*See* Dkts. 50, 56.) The memorandum was listed as Exhibit 2 of the first list and Exhibit 3 of the second list. (*See* Dkts. 50, 56.) The second list indicates—for each exhibit on the list—the dates on which the exhibit was identified and admitted and whether the exhibit was admitted over an objection. (*See* Dkt. 56.) Although the list indicates that the three other exhibits shown thereon were admitted without objection on the first day of the trial, the list is silent as to the admission of the memorandum. (*See id.*) During the trial, Mr. Gray identified the memorandum as Exhibit 3 and requested that it be admitted. (Dkt. 61 at 214.) As admission of the memorandum was unopposed, the magistrate judge granted the request. (*Id.*) Mr. Gray then prompted Inspector Mohammed to read portions of the memorandum. (*Id.* at 215.) After Inspector Mohammed did so, the magistrate judge noted for the record that the memorandum was Exhibit 2 of Mr. Gray's exhibit list. (*Id.* at 216.) The exhibits attached to the second list do not appear to include the memorandum. (*See* Dkts. 56-1, 56-2, 56-3.) However, the USB drive with the video evidence includes the memorandum (as the Ex 2 file in the Defendant Joshua Gray's Exhibits folder). Moreover, the memorandum is available online. *See* Kevin K. McAleenan, *Information Regarding First Amendment Protected Activities*, U.S. Dep't of Homeland Sec. (May 17, 2019), https://www.dhs.gov/sites/default/files/2026-03/info_regarding_first_amendment_protected_activities_as1_signed_05.17.2019-508.pdf. The magistrate judge did not rely on the memorandum to find the Defendants guilty. (*See* Dkt. 77.)

motions. (*Id.* at 31–32, 37.) In July 2024, the parties submitted the additional briefing and presented oral argument on the Defendants' motions. (*See* Dkts. 66 to 71.) The Defendants did not make any arguments related to double jeopardy during the trial, in post-trial briefing, or at oral argument. In December 2024, the magistrate judge denied the motions and found the Defendants guilty of all charges. (Dkt. 77.) The magistrate judge first determined that the charges did not violate the Defendants' First Amendment rights because the SSA field offices were nonpublic forums and the videorecording prohibition was viewpoint-neutral and reasonable. (*Id.* at 5–8.) *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (recognizing that when "[p]ublic property . . . is not by tradition or designation a forum for public communication," the state "may reserve the [property] for its intended purposes . . . as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view"). The magistrate judge then explained that each Defendant was guilty of each count. (Dkt. 77 at 9–16.)

With respect to count one, the magistrate judge found that on November 16, 2022, Mr. Gray not only filmed the signage showing the videorecording prohibition in the Deland SSA office but also read the signage aloud and then continued to videorecord in the office contrary to the prohibition. (*Id.* at 9–10.) The magistrate judge further found that Officer Davenport instructed Mr. Gray that he could not film inside the office but Mr. Gray did not comply with the instruction. (*Id.*) With respect to count two, the magistrate judge determined that although Mr. Gray did not secure permission from the SSA—the occupying agency—to videorecord inside the office, he

recorded there anyway. (*Id.*) With respect to count three, the magistrate judge found that on January 6, 2023, Mr. Metz filmed the signage stating the videorecording prohibition in the Ocala office but continued to videorecord. (*Id.* at 10–12.) With respect to count four, the magistrate judge found that Mr. Metz did not receive SSA permission to record in the office but nonetheless recorded there. (*Id.*) With respect to count five, the magistrate judge explained that on January 26, 2023, each Defendant filmed the signage prohibiting videorecording in the Kissimmee office but continued to videorecord. (*Id.* at 12–13.) The magistrate judge additionally noted that the PSO on duty directed the Defendants to "confine their filming to the vestibule area[] yet they did not comply with that direction." (*Id.* at 13.) With respect to count six, the magistrate judge determined that neither Defendant obtained SSA permission to film in the office but filmed there anyway. (*Id.* at 12–14.) With respect to count seven, the magistrate judge found that on January 30, 2023, each Defendant captured the signage with the videorecording prohibition on camera yet continued to videorecord inside the Orlando office. (*Id.* at 14–16.) The magistrate judge further found that Mr. Flores "clearly directed the Defendants to stop filming[] and they refused to do so." (*Id.* at 16.) With respect to count eight, the magistrate judge determined that neither Defendant obtained SSA permission to record inside the office but recorded there nonetheless. (*Id.*) Ultimately, each Defendant was sentenced to six months of probation, a $30 special assessment, and a $3,000 fine. (Dkts. 84, 85.) Imposition of the fines was stayed pending this appeal. (Dkts. 86, 87.)

## APPLICABLE STANDARDS

When appealing from a magistrate judge's judgment, a criminal defendant is not entitled to a de novo trial by a district court. Fed. R. Crim. P. 58(g)(2)(D). Rather, the "scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered" by a district court. *Id.*; *see* 18 U.S.C. § 3742(h). Appellate courts "review de novo . . . whether the evidence is sufficient to support a conviction." *United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013). When considering this issue, appellate courts "view the evidence in the light most favorable to the prosecution and draw all reasonable inferences and credibility choices in favor of the . . . verdict." *Id.* The conviction must be affirmed "unless there is no reasonable construction of the evidence from which" the defendant could have been found "guilty beyond a reasonable doubt." *Id.* Appellate courts also review de novo the interpretation of regulations. *See United States v. Johnson*, 399 F.3d 1297, 1298 (11th Cir. 2005); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) (requiring courts to "exercise their independent judgment" respecting "legal interpretation").

Appellate courts review for plain error double jeopardy issues not raised below. *United States v. Bobb*, 577 F.3d 1366, 1371 (11th Cir. 2009). "Under the plain error standard, [a reviewing court] will affirm . . . unless: (1) there was an error in the . . . proceedings [below,] (2) the error was plain[,] and (3) the error affected the defendant's substantial rights." *Id.* "If these conditions are met, [the reviewing court] may exercise [its] discretion and vacate the conviction if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* "To constitute

plain error, the deficiency must be obvious and substantial, affecting the fairness or integrity of the trial." *Id.* (alterations adopted and quotation omitted).

## ANALYSIS

Mr. Gray challenges all his convictions, asserting three bases. (Dkt. 115 at 8–22.) First, in his view, insufficient evidence established that the SSA had security regulations, rules, orders, or directives prohibiting videorecording in field offices under the meaning of section 102-74.420. (*Id.* at 9–18.) Second, Mr. Gray argues, he complied with sections 102-74.385 and 102-74.420 by filming in the entranceways of the SSA offices for news purposes. (*Id.* at 18–19.) Third, Mr. Gray contends that the section 102-74.385 counts are lesser included offenses of the section 102-74.420 counts and thus convicting him under both sections for the same misconduct violated his double jeopardy rights. (*Id.* at 19–22.) Regarding the third basis, Mr. Gray does not mention plain error review or address the issues attendant to such review, including substantial rights and the fairness and integrity of proceedings. (*See id.*) Mr. Metz makes similar arguments, asking the court to dismiss his section 102-74.420 convictions for insufficient evidence and, in the alternative, to dismiss his section 102-74.385 convictions as violative of his double jeopardy rights. (Dkt. 108 at 10–19.) Like Mr. Gray, Mr. Metz does not discuss plain error issues, (*see id.* at 16–19), although Mr. Metz acknowledges the plain error standard, (*id.* at 9), and conclusorily asserts that his multiplicitous convictions "plainly violate[ his] Fifth Amendment right against cumulative punishment," (*id.* at 19).

In response, the Government contends that sufficient evidence supports the Defendants' convictions under sections 102-74.385 and 102-74.420. (Dkt. 116 at 11–14; Dkt. 117 at 11–16.) According to the Government, the record indicates that the Defendants violated the former section by failing to comply with official signage and lawful directions to stop videorecording and violated the latter section by taking photographs—through videos—of spaces occupied by a tenant agency—here, the SSA—without the permission of that agency or an authorized official thereof. (Dkt. 116 at 11–14; Dkt. 117 at 11–16.) As to double jeopardy, the Government asserts that the Defendants' rights have not been infringed because the elements of a section 102-74.385 violation require different proof from the elements of a section 102-74.420 violation. (Dkt. 116 at 14–16; Dkt. 117 at 17–18.) The Government further argues that the Defendants have not established that any error was plain, as defendants in other cases have been convicted under both sections for an instance of videorecording inside an SSA field office. (Dkt. 116 at 16–17; Dkt. 117 at 19.)

In their appellate briefs, the Defendants do not contend that the sections under which they were convicted violate their First Amendment rights. (*See* Dkt. 108 at 15 (referring to the First Amendment only once, in the context of generally identifying Mr. Metz as a First Amendment auditor); Dkt. 115 at 8–19 (mentioning First Amendment rights in passing while presenting arguments related to the sufficiency of the evidence for Mr. Gray's convictions); *see also* Dkt. 116 (omitting any reference to the First Amendment when responding to Mr. Metz); Dkt. 117 at 16 (briefly addressing Mr. Gray's statements regarding the First Amendment as part of the

Government's position that sufficient evidence supports his section 102-74.385 convictions).) "[A]n appellant abandons an issue on appeal when he fails to raise and meaningfully develop it in his initial brief." *Castro-Reyes v. City of Opa-Locka*, 166 F.4th 886, 904 (11th Cir. 2026); *accord United States v. Holley*, 166 F.4th 139, 151 (11th Cir. 2026) ("The law in [the Eleventh] Circuit requires an argument to be raised *and developed* in an initial brief[; otherwise, the argument] is considered abandoned.").

Because the Defendants have accordingly abandoned any First Amendment challenge to section 102-74.385 or 102-74.420, the court does not conduct a First Amendment analysis. Instead, the court limits its consideration to the parties' arguments, which focus on sufficiency of the evidence and double jeopardy. (*See* Dkts. 108, 115, 116, 117.)[3] The court examines the sufficiency of the evidence for the Defendants' section 102-74.385 and section 102-74.420 convictions in turn, "view[ing] the evidence in the light most favorable to the prosecution and draw[ing] all reasonable inferences and credibility choices in favor of the . . . verdict." *See Joseph*, 709 F.3d at 1093. The court then conducts the double jeopardy analysis. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932); *Bobb*, 577 F.3d at 1371–72.

[3] The magistrate judge's First Amendment analysis was well-reasoned and supported by Supreme Court and Eleventh Circuit caselaw. (*See* Dkt. 77 at 5–8.) To the extent that the Defendants advance a First Amendment argument on appeal, the court considers the issue de novo, *see Peek-a-Boo Lounge of Bradenton, Inc. v. Manatee County*, 337 F.3d 1251, 1255 (11th Cir. 2003) ("The constitutionality of a statute is a question of law subject to de novo review."); *see also Loper Bright*, 603 U.S. at 412, and rejects the argument for the reasons explained by the magistrate judge, *see Perry*, 460 U.S. at 46.

**A. Section 102-74.385 Convictions**

Counts one, three, five, and seven charged the Defendants with violating section 102-74.385. (Dkt. 1 at 1–4.) That section required the Defendants' compliance with "official signs of a prohibitory, regulatory, or directory nature and with the lawful direction of [f]ederal police officers and other authorized individuals." 41 C.F.R. § 102-74.385. Accordingly, the failure to comply with either such official signage or such a lawful direction suffices to affirm a section 102-74.385 conviction. *See United States v. Radin*, No. 16-cr-528 (RJS), 2018 WL 1384514, at *4, 2018 U.S. Dist. LEXIS 44458, at *11 (S.D.N.Y. Mar. 18, 2018) (listing as an element of a section 102-74.385 violation that "the defendant failed to comply with either (i) an official sign of a prohibitory, regulatory, or directory nature[] or (ii) the lawful direction of federal police officers and other authorized individuals"), *aff'd*, 821 F. App'x 53, 54 (2d Cir. 2020); *United States v. Brasch*, 95 Cr. 865 (PKL), 1996 WL 720090, at *3–4, 1996 U.S. Dist. LEXIS 18487, at *8–9 (S.D.N.Y. Dec. 12, 1996) (examining 41 C.F.R. § 101-20.304, a former federal regulation with substantially the same wording as section 102-74.385, and explaining that a violation of the regulation required that "the defendant failed to comply with either (i) an official sign of a prohibitory, regulatory, or directory nature[] or (ii) the lawful direction of Federal Protective Officers and other authorized individuals"), *aff'd*, No. 98-1541, 1999 WL 1254509, at *4, 1999 U.S. App. LEXIS 32159, at *11 (2d Cir. Dec. 8, 1999); *see also United States v. Moriello*, 980 F.3d 924, 934 (4th Cir. 2020) (affirming a section 102-74.385 conviction based on the failure to comply with a lawful direction rather than official signage); *Index Newspapers LLC v.*

*U.S. Marshals Serv.*, 977 F.3d 817, 832 n.10 (9th Cir. 2020) (noting—without reference to official signage—that section 102-74.385 "require[d] people 'in and on property' to obey the 'lawful direction of federal police officers and other authorized individuals'" (quoting 41 C.F.R. § 102-74.385 and citing *United States v. Baldwin*, 745 F.3d 1027, 1029 (10th Cir. 2014))).

The magistrate judge found the Defendants guilty of the alleged section 102-74.385 violations because the Defendants continued to film inside the SSA offices even after the Defendants saw the signage prohibiting such filming. (Dkt. 77 at 10, 12–13, 16.) The Defendants' own video recordings substantiate this finding. For counts one, five, and seven, the court cites footage from the This is a Public Service YouTube account taken from Mr. Gray's point of view. (Dkt. 55-1 (Gov't Ex. 1a) at 01:21–06:37 (showing Mr. Gray entering the SSA office in Deland while videorecording, reading aloud signage stating the SSA's videorecording prohibition, and then walking around the interior of the office while videorecording, including at Officer Davenport's security desk and in spaces where customers sought SSA services); Dkt. 55-7 (Gov't Ex. 3) at 00:21–10:00 (showing the Defendants continuing to record inside the SSA office in Kissimmee, including at the security desk, after a PSO pointed the Defendants to signage stating the videorecording prohibition and discussed the prohibition with them); Dkt. 55-9 (Gov't Ex. 5a) at 00:00–06:03, 06:54–09:27 (showing the Defendants continuing to record inside the SSA office in Orlando, including at Officer Suarez's security desk and in spaces where customers sought SSA services, after the Defendants noted signage with the videorecording prohibition posted inside the office).) For count

three, the court cites footage from the rouge nation YouTube account taken from Mr. Metz's point of view. (Dkt. 55-19 (Gov't Ex. 9) at 02:18–04:27 (showing Mr. Metz continuing to videorecord inside the SSA office in Ocala, including at the security desk, after he noted signage with the videorecording prohibition posted inside the office).) Moreover, the record contains photographs of the signage in the offices. (Dkts. 55-5, 55-6, 55-8, 55-12, 55-17, 55-18.) The video and photographic evidence suffices to establish the section 102-74.385 violations. *See United States v. West*, No. 3:25-cr-00118-IM-1, 2025 WL 2416975, at *5–6, 2025 U.S. Dist. LEXIS 162515, at *15–16 (D. Or. Aug. 21, 2025) (upholding a section 102-74.385 conviction against a sufficiency of the evidence challenge when the defendant videorecorded inside an SSA hearing office because a reasonable factfinder could conclude that "by recording in the SSA [h]earing [o]ffice after reading" signage stating the SSA's videorecording prohibition, the defendant "willfully disobeyed the sign prohibiting recording").

For counts one, five, and seven, the magistrate judge further found that the Defendants failed to comply with lawful directions, issued by federal police officers and other authorized individuals, to stop filming inside the SSA offices. (Dkt. 77 at 10, 13, 16.) Sufficient evidence also supports this finding. As to count one, Officer Davenport testified that Mr. Gray entered the Deland office while videorecording, that she informed him he could not videorecord in the office, that she pointed him to signage stating the prohibition, and that he nonetheless continued to record. (Dkt. 61 at 124–30.) This testimony, corroborated by the video evidence, (*see* Dkt. 55-1 (Gov't Ex. 1a) at 01:21–06:37), shows that Mr. Gray did not comply with Officer Davenport's

lawful direction to stop recording. As to count five, Inspector Mohammed's testimony indicates that the Defendants did not comply with the videorecording prohibition, thereby prompting the PSO on duty to tolerate videorecording in part of the office away from sensitive information. (*See* Dkt. 61 at 162–65, 167.) The magistrate judge found that the Defendants did not limit their filming to this part of the office, (Dkt. 77 at 13), and the Defendants' own video recordings support this finding, (*e.g.*, Dkt. 55-7 (Gov't Ex. 3) at 02:05–10:05 (showing the PSO directing the Defendants as to the limited area where they could record in the Kissimmee office and the Defendants then recording beyond that area)). As to count seven, the Defendants' own video recordings show that Mr. Flores directed the Defendants to stop filming and that they refused to do so. (*E.g.*, Dkt. 55-9 (Gov't Ex. 5a) at 18:40–30:10.) Consequently, sufficient evidence supports the Defendants' section 102-74.385 convictions. *See West*, 2025 WL 2416975, at *5, 2025 U.S. Dist. LEXIS 162515, at *13 (deeming the evidence sufficient to affirm a section 102-74.385 conviction when the evidence supported the following: an FPS officer on duty in an SSA hearing office told the defendant that videorecording was prohibited in SSA hearing offices, the officer pointed the defendant to signage stating the prohibition, and the defendant nonetheless continued to record inside the SSA hearing office).

**B. Section 102-74.420 Convictions**

Counts two, four, six, and eight charged the Defendants with violating section 102-74.420. (Dkt. 1 at 1–5.) That section prohibited "tak[ing] photographs of" a "[s]pace occupied by a tenant agency" either without "the permission of the occupying

agency" or where "security regulations, rules, orders, or directives appl[ied]" to prohibit the photography. 41 C.F.R. § 102-74.420. The magistrate judge found the Defendants guilty of the alleged section 102-74.420 violations because the Defendants did not obtain "the permission of either the occupying agency or an authorized official of the occupying agency to film at the SSA office." (Dkt. 77 at 10, 12, 14, 16.) Sufficient evidence supports the section 102-74.420 convictions. Inspector Mohammed testified that the SSA was the sole occupying agency for all the offices at issue, and he indicated that the SSA offices lacked lobbies, foyers, corridors, and similar shared areas seen in buildings occupied by multiple agencies. (Dkt. 61 at 149–50, 202; Dkt. 62 at 14, 16–17.) Therefore, in the light most favorable to the Government, the interior of each SSA field office was a space occupied by a tenant agency, and the Defendants could not take photographs, including videos, of the spaces without SSA permission. As to count two, Officer Davenport testified that Mr. Gray did not have permission to videorecord inside the Deland office. (Dkt. 61 at 130.) As to counts four and six, the Defendants' own video recordings, (*e.g.*, Dkt. 55-7 (Gov't Ex. 3) at 00:21–10:00 (showing the Defendants in the Kissimmee office); Dkt. 55-19 (Gov't Ex. 9) at 00:44–04:27 (showing Mr. Metz in the Ocala office)), and Inspector Mohammed's testimony concerning the Kissimmee and Ocala incidents, (Dkt. 61 at 162–65, 167, 178–81; Dkt. 62 at 12, 17–19), indicated that the Defendants lacked SSA permission to record where they recorded in the offices. As to count eight, Mr. Flores and Officer Suarez each testified that the Defendants did not have permission from SSA management to record in the Orlando office. (Dkt. 61 at 40, 90.)

The section 102-74.420 convictions can be affirmed based on the Defendants' lack of SSA permission alone. *See United States v. Cordova*, No. 23-cr-00453-NYW-1, 2024 WL 4494300, at *2–5, 2024 U.S. Dist. LEXIS 187447, at *5–12 (D. Colo. Oct. 15, 2024) (determining that sufficient evidence supported a section 102-74.420 conviction when a reasonable factfinder could conclude from the evidence that the defendant lacked the SSA's permission to videorecord in an SSA office but nevertheless entered the SSA office while videorecording).

Additionally, evidence supports that security rules prohibited photography and videorecording inside the SSA offices. POMS GN 03360.010 stated: "Photography and video[]recording are prohibited in [f]ederal space without the permission of the tenant agency (41 U.S.C. § 102-74.420)." (Dkt. 55-20.) Operational Readiness Order HQ-ORO-002-2018 stated: "SSA has rules that prohibit photography and videotaping in its spaces. . . . The prohibition must be clearly posted or actual (in-person) notice must be given in order to be enforced." (Dkt. 56-1 at 3.) Signage posted in the offices clearly displayed the videorecording prohibition. (Dkts. 55-3, 55-4, 55-5, 55-6, 55-8, 55-11, 55-12, 55-16, 55-17, 55-18.) Mr. Flores testified that as a general proposition, photography and videorecording inside SSA field offices were prohibited for reasons related to privacy and security. (Dkt. 61 at 17–18.) Every witness at trial testified to the SSA videorecording prohibition. (*Id.* at 17–18, 25, 30, 86–87, 94–97, 99, 105, 107–09, 123–24, 127, 130–31, 134, 167, 203; Dkt. 62 at 6.) Therefore, the section 102-74.420 convictions can also be affirmed based on security rules prohibiting videorecording inside SSA offices. *See West*, 2025 WL 2416975, at *6, 2025 U.S. Dist.

LEXIS 162515, at *16–18 (explaining that sufficient evidence supported a section 102-74.420 conviction when evidence indicated that the defendant videorecorded inside an SSA hearing office in violation of an SSA rule prohibiting such videorecording).

**C. Double Jeopardy**

"The Fifth Amendment's Double Jeopardy Clause guarantees that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Bobb*, 577 F.3d at 1371 (quoting U.S. Const. amend. V). This guarantee protects against "multiple punishments for the same offense." *Id.* As relevant here, "where two [regulatory] provisions proscribe the same offense and there is no clear indication that the legislature intended multiple punishments for the offense, the Double Jeopardy Clause's prohibition against multiple punishments protects a defendant from being convicted under both provisions." *Id.* at 1371–72. "[W]here the same act . . . constitutes a violation of two distinct . . . provisions, the test to be applied to determine whether there are two offenses or only one[] is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. This "analysis focuses on the proof necessary to establish the . . . elements of each offense, not the actual evidence presented at trial." *Bobb*, 577 F.3d at 1372.

When the Defendants were convicted, the elements of a section 102-74.385 violation included that the defendant knowingly failed to comply with official signs of a prohibitory, regulatory, or directory nature or with the lawful direction of federal police officers or other authorized individuals. *See* 41 C.F.R. § 102-74.385; *see also Radin*, 2018 WL 1384514, at *4, 2018 U.S. Dist. LEXIS 44458, at *11; *Brasch*, 1996

U.S. Dist. LEXIS 18487, at *8–9. (*See* Dkt. 24 at 1.) Further, at that time, the elements of a section 102-74.420 violation included that the defendant took one or more photographs and that the photograph or photographs were prohibited by security regulations, rules, orders, or directives or by a federal court order or rule, were of a space occupied by a tenant agency for non-commercial purposes without the permission of the occupying agency, or were of a space occupied by a tenant agency for commercial purposes without the written permission of an authorized official of the occupying agency. *See* 41 C.F.R. § 102-74.420; *see also West*, 2025 WL 2416975, at *6, 2025 U.S. Dist. LEXIS 162515, at *16–17. (*See* Dkt. 24 at 1–2.) Because "each provision require[d] proof of a fact which the other d[id] not," *see Blockburger*, 284 U.S. at 304, the Defendants' convictions under both sections for different conduct during the same incident did not violate the Defendants' double jeopardy rights.

Even if the Defendants' convictions implicated a double jeopardy error, this issue was not raised below, (*see* Dkts. 61, 62, 66 to 71), and is thus reviewed under the plain error standard, *see Bobb*, 577 F.3d at 1371. The court notes that a party "abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014); *see United States v. Markovich*, 95 F.4th 1367, 1379 (11th Cir. 2024) (applying this principle in a criminal defendant's appeal). In this case, because the Defendants insufficiently address the requirements of plain error review, (*see* Dkts. 108, 115), they do not establish that any double jeopardy error "was plain," "affected [their] substantial rights," or "seriously affect[ed]

the fairness, integrity, or public reputation of judicial proceedings." *See Bobb*, 577 F.3d at 1371. In any event, any double jeopardy error in this case was not plain. *See United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003) ("[W]here the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or [the Eleventh Circuit] directly resolving it."); *see also Cordova*, 2024 WL 4494300, at *9, 2024 U.S. Dist. LEXIS 187447, at *23 (affirming the defendant's section 102-74.385 and 102-74.420 convictions when they were based on a single incident of filming in an SSA office). Therefore, the court affirms the Defendants' convictions.

**CONCLUSION**

Accordingly, the Defendants' convictions are **AFFIRMED**.

**ORDERED** in Orlando, Florida, on May 26, 2026.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties